# TURNER BROADCASTING SYSTEM, INC., ET AL. v. FEDERAL COMMUNICATIONS COMMISSION ET AL.

No. 95–992. Argued October 7, 1996—Decided March 31, 1997

182

*H. Bartow Farr III* argued the cause for appellants. With him on the briefs for appellant National Cable Television Association, Inc., were *Richard G. Taranto, Daniel L. Brenner, Neal M. Goldberg,* and *Diane B. Burstein. Bruce D. Sokler, Christopher A. Holt, Bertram W. Carp, Bruce D. Collins, Neal S. Grabell,* and *James H. Johnson* filed a brief for appellants Turner Broadcasting System, Inc., et al. *Albert G. Lauber, Jr., Peter Van N. Lockwood, Judith A. McHale,* and *Diane L. Hofbauer* filed a brief for appellants Discovery Communications, Inc., et al. *Robert D. Joffe, Stuart W. Gold, Rowan D. Wilson, Brian Conboy,* and *Theodore Case Whitehouse* filed a brief for appellant Time Warner Entertainment Co.

*Acting Solicitor General Dellinger* argued the cause for appellees. With him on the briefs for the federal appellees were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Wallace, Paul R. Q. Wolfson, Douglas N. Letter, Bruce G. Forrest, William E. Kennard,* and *Christopher J. Wright. Bruce J. Ennis, Jr.,* argued the cause and filed a brief for appellees National Association of Broadcasters et al. With him on the brief were *Kit A. Pierson, Donald B. Verrilli, Jr., Thomas J. Perrelli, Jack N. Goodman, Benjamin F. P. Ivins, Kathleen M. Sullivan,* and *James J. Popham. Carolyn F. Corwin, Mark H. Lynch, Marilyn Mohrman-Gillis,* and *Paula A. Jameson* filed a brief for appellees Association of America's Public Television Stations et al. *Andrew Jay Schwartzman, Gigi B. Sohn,* and *Elliot M. Mincberg* filed a brief for appellees Consumer Federation of America et al.

JUSTICE KENNEDY delivered the opinion of the Court, except as to a portion of Part II–A–1.

Sections 4 and 5 of the Cable Television Consumer Protection and Competition Act of 1992 require cable television systems to dedicate some of their channels to local broadcast television stations. Earlier in this case, we held the so-called "must-carry" provisions to be content-neutral restrictions on speech, subject to intermediate First Amendment scrutiny under *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968). A plurality of the Court considered the record as then developed insufficient to determine whether the provisions were narrowly tailored to further important governmental interests, and we remanded the case to the District Court for the District of Columbia for additional factfinding.

On appeal from the District Court's grant of summary judgment for appellees, the case now presents the two questions left open during the first appeal: First, whether the record as it now stands supports Congress' predictive judgment that the must-carry provisions further important governmental interests; and second, whether the provisions do not burden substantially more speech than necessary to further those interests. We answer both questions in the affirmative, and conclude the must-carry provisions are consistent with the First Amendment.

I

An outline of the Cable Act, Congress' purposes in adopting it, and the facts of the case are set out in detail in our first opinion, see *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622 (1994) *(Turner),* and a more abbreviated summary will suffice here. Soon after Congress enacted the Cable Television Consumer Protection and Competition Act of 1992 (Cable Act), Pub. L. 102–385, 106 Stat. 1460, appellants brought suit against the United States and the Federal Communications Commission (FCC) (both referred to here as the Government) in the United States District Court for

the District of Columbia, challenging the constitutionality of the must-carry provisions under the First Amendment. The three-judge District Court, in a divided opinion, granted summary judgment for the Government and intervenor-defendants. A majority of the court sustained the must-carry provisions under the intermediate standard of scrutiny set forth in *United States* v. *O'Brien, supra,* concluding the must-carry provisions were content-neutral "industry-specific antitrust and fair trade" legislation narrowly tailored to preserve local broadcasting beset by monopoly power in most cable systems, growing concentration in the cable industry, and concomitant risks of programming decisions driven by anticompetitive policies. 819 F. Supp. 32, 40, 45–47 (1993).

On appeal, we agreed with the District Court that must-carry does not "distinguish favored speech from disfavored speech on the basis of the ideas or views expressed," 512 U. S., at 643, but is a content-neutral regulation designed "to prevent cable operators from exploiting their economic power to the detriment of broadcasters," and "to ensure that all Americans, especially those unable to subscribe to cable, have access to free television programming—whatever its content." *Id.,* at 649. We held that, under the intermediate level of scrutiny applicable to content-neutral regulations, must-carry would be sustained if it were shown to further an important or substantial governmental interest unrelated to the suppression of free speech, provided the incidental restrictions did not " 'burden substantially more speech than is necessary to further' " those interests. *Id.,* at 662 (quoting *Ward* v. *Rock Against Racism,* 491 U. S. 781, 799 (1989)). Although we "ha[d] no difficulty concluding" the interests must-carry was designed to serve were important in the abstract, 512 U. S., at 663, a four-Justice plurality concluded genuine issues of material fact remained regarding whether "the economic health of local broadcasting is in genuine jeopardy and in need of the protections afforded by must-carry,"

and whether must-carry "'burden[s] substantially more speech than is necessary to further the government's legitimate interests.'" *Id.*, at 665 (quoting *Ward, supra,* at 799). JUSTICE STEVENS would have found the statute valid on the record then before us; he agreed to remand the case to ensure a judgment of the Court, and the case was returned to the District Court for further proceedings. 512 U. S., at 673–674 (opinion concurring in part and concurring in judgment); *id.,* at 667–668.

The District Court oversaw another 18 months of factual development on remand "yielding a record of tens of thousands of pages" of evidence, *Turner Broadcasting* v. *FCC,* 910 F. Supp. 734, 755 (1995), comprised of materials acquired during Congress' three years of pre-enactment hearings, see *Turner, supra,* at 632–634, as well as additional expert submissions, sworn declarations and testimony, and industry documents obtained on remand. Upon consideration of the expanded record, a divided panel of the District Court again granted summary judgment to appellees. 910 F. Supp., at 751. The majority determined "Congress drew reasonable inferences" from substantial evidence before it to conclude that "in the absence of must-carry rules, 'significant' numbers of broadcast stations would be refused carriage." *Id.,* at 742. The court found Congress drew on studies and anecdotal evidence indicating "cable operators had already dropped, refused to carry, or adversely repositioned significant numbers of local broadcasters," and suggesting that in the vast majority of cases the broadcasters were not restored to carriage in their prior position. *Ibid.* Noting evidence in the record before Congress and the testimony of experts on remand, *id.,* at 743, the court decided the noncarriage problem would grow worse without must-carry because cable operators had refrained from dropping broadcast stations during Congress' investigation and the pendency of this litigation, *id.,* at 742–743, and possessed increasing incentives to use their growing economic power to

capture broadcasters' advertising revenues and promote affiliated cable programmers, *ibid.* The court concluded "substantial evidence before Congress" supported the predictive judgment that a local broadcaster denied carriage "would suffer financial harm and possible ruin." *Id.*, at 743–744. It cited evidence that adverse carriage actions decrease broadcasters' revenues by reducing audience levels, *id.*, at 744–745, and evidence that the invalidation of the FCC's prior must-carry regulations had contributed to declining growth in the broadcast industry, *id.*, at 744, and n. 34.

The court held must-carry to be narrowly tailored to promote the Government's legitimate interests. It found the effects of must-carry on cable operators to be minimal, noting evidence that: most cable systems had not been required to add any broadcast stations since the rules were adopted; only 1.2 percent of all cable channels had been devoted to broadcast stations added because of must-carry; and the burden was likely to diminish as channel capacity expanded in the future. *Id.*, at 746–747. The court proceeded to consider a number of alternatives to must-carry that appellants had proposed, including: a leased-access regime, under which cable operators would be required to set aside channels for both broadcasters and cable programmers to use at a regulated price; use of so-called A/B switches, giving consumers a choice of both cable and broadcast signals; a more limited set of must-carry obligations modeled on those earlier used by the FCC; and subsidies for broadcasters. The court rejected each in turn, concluding that "even assuming that [the alternatives] would be less burdensome" on cable operators' First Amendment interests, they "are not in any respect as effective in achieving the government's [interests]." *Id.*, at 747. Judge Jackson would have preferred a trial to summary judgment, but concurred in the judgment of the court. *Id.*, at 751–754.

Judge Williams dissented. His review of the record, and particularly evidence concerning growth in the number of

broadcasters, industry advertising revenues, and per-station profits during the period without must-carry, led him to conclude the broadcast industry as a whole would not be "'seriously jeopardized'" in the absence of must-carry. *Id.*, at 759–767. Judge Williams acknowledged the Government had a legitimate interest in preventing anticompetitive behavior, and accepted that cable operators have incentives to discriminate against broadcasters in favor of their own vertically integrated cable programming. *Id.*, at 772, 775, 779. He would have granted summary judgment for appellants nonetheless on the ground must-carry is not narrowly tailored. In his view, must-carry constitutes a significant (though "diminish[ing]," *id.*, at 782) burden on cable operators' and programmers' rights, *ibid.*, and the Cable Act's must-carry provisions suppress more speech than necessary because "less-restrictive" alternatives exist to accomplish the Government's legitimate objectives, *id.*, at 782–789.

This direct appeal followed. See 47 U. S. C. § 555(c)(1); 28 U. S. C. § 1253. We noted probable jurisdiction, 516 U. S. 1110 (1996), and we now affirm.

## II

We begin where the plurality ended in *Turner*, applying the standards for intermediate scrutiny enunciated in *O'Brien*. A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests. *O'Brien*, 391 U. S., at 377. As noted in *Turner*, must-carry was designed to serve "three interrelated interests: (1) preserving the benefits of free, over-the-air local broadcast television, (2) promoting the widespread dissemination of information from a multiplicity of sources, and (3) promoting fair competition in the market for television programming." 512 U. S., at 662. We decided then, and now reaffirm, that each of those is an important

governmental interest. We have been most explicit in holding that " 'protecting noncable households from loss of regular television broadcasting service due to competition from cable systems' is an important federal interest." *Id.*, at 663 (quoting *Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691, 714 (1984)). Forty percent of American households continue to rely on over-the-air signals for television programming. Despite the growing importance of cable television and alternative technologies, " 'broadcasting is demonstrably a principal source of information and entertainment for a great part of the Nation's population.' " *Turner, supra,* at 663 (quoting *United States* v. *Southwestern Cable Co.,* 392 U. S. 157, 177 (1968)). We have identified a corresponding "governmental purpose of the highest order" in ensuring public access to "a multiplicity of information sources," 512 U. S., at 663. And it is undisputed the Government has an interest in "eliminating restraints on fair competition ... , even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment." *Id.*, at 664.

On remand, and again before this Court, both sides have advanced new interpretations of these interests in an attempt to recast them in forms "more readily proven." 910 F. Supp., at 759 (Williams, J., dissenting). The Government downplays the importance of showing a risk to the broadcast industry as a whole and suggests the loss of even a few broadcast stations "is a matter of critical importance." Tr. of Oral Arg. 23. Taking the opposite approach, appellants argue Congress' interest in preserving broadcasting is not implicated unless it is shown the industry as a whole would fail without must-carry, Brief for Appellant National Cable Television Association, Inc. 18–23 (NCTA Brief); Brief for Appellant Time Warner Entertainment Co., L. P. 8–10 (Time Warner Brief), and suggest Congress' legitimate interest in "assuring that the public has access to a multiplicity of information sources," *Turner, supra,* at 663, extends only as far

as preserving "a minimum amount of television broadcast service," Time Warner Brief 28; NCTA Brief 40; Reply Brief for Appellant NCTA 12.

These alternative formulations are inconsistent with Congress' stated interests in enacting must-carry. The congressional findings do not reflect concern that, absent must-carry, "a few voices," Tr. of Oral Arg. 23, would be lost from the television marketplace. In explicit factual findings, Congress expressed clear concern that the "marked shift in market share from broadcast television to cable television services," Cable Act § 2(a)(13), note following 47 U. S. C. § 521, resulting from increasing market penetration by cable services, as well as the expanding horizontal concentration and vertical integration of cable operators, combined to give cable systems the incentive and ability to delete, reposition, or decline carriage to local broadcasters in an attempt to favor affiliated cable programmers. §§ 2a(2)–(5), (15). Congress predicted that "absent the reimposition of [must-carry], additional local broadcast signals will be deleted, repositioned, or not carried," § 2(a)(15); see also § 2(a)(8)(D), with the end result that "the economic viability of free local broadcast television and its ability to originate quality local programming will be seriously jeopardized," § 2(a)(16).

At the same time, Congress was under no illusion that there would be a complete disappearance of broadcast television nationwide in the absence of must-carry. Congress recognized broadcast programming (and network programming in particular) "remains the most popular programming on cable systems," § 2(a)(19). Indeed, reflecting the popularity and strength of some broadcasters, Congress included in the Cable Act a provision permitting broadcasters to charge cable systems for carriage of the broadcasters' signals. See § 6, codified at 47 U. S. C. § 325. Congress was concerned not that broadcast television would disappear in its entirety without must-carry, but that without it, "significant numbers of broadcast stations will be refused carriage on cable sys-

tems," and those "broadcast stations denied carriage will either deteriorate to a substantial degree or fail altogether." 512 U. S., at 666. See, e. g., H. R. Rep. No. 102–628, p. 51 (1992) (House Report) (the absence of must-carry "will result in a weakening of the over-the-air television industry and a reduction in competition"); id., at 64 ("The Committee wishes to make clear that its concerns are not limited to a situation where stations are dropped wholesale by large numbers of cable systems"); S. Rep. No. 102–92, p. 62 (1991) (Senate Report) ("Without congressional action, . . . the role of local television broadcasting in our system of communications will steadily decline . . ."); see also Brief for Federal Appellees in *Turner Broadcasting System, Inc.* v. *FCC*, No. 93–44, p. 32, n. 22 (the question is not whether "the evidence shows that broadcast television is likely to be totally eliminated" but "whether the broadcast services available to viewers [without cable] are likely to be reduced to a significant extent, because of either loss of some stations altogether or curtailment of services by others").

Nor do the congressional findings support appellants' suggestion that legitimate legislative goals would be satisfied by the preservation of a rump broadcasting industry providing a minimum of broadcast service to Americans without cable. We have noted that "'it has long been a basic tenet of national communications policy that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public."'" *Turner*, 512 U. S., at 663–664 (quoting *United States* v. *Midwest Video Corp.*, 406 U. S. 649, 668, n. 27 (1972) (plurality opinion), in turn quoting *Associated Press* v. *United States*, 326 U. S. 1, 20 (1945)); see also *FCC* v. *WNCN Listeners Guild*, 450 U. S. 582, 594 (1981). "'[I]ncreasing the number of outlets for community self-expression'" represents a "'long-established regulatory goa[l] in the field of television broadcasting.'" *United States* v. *Midwest Video Corp.*, *supra*, at

667–668 (plurality opinion). Consistent with this objective, the Cable Act's findings reflect a concern that congressional action was necessary to prevent "a reduction in the number of media voices available to consumers." § 2(a)(4). Congress identified a specific interest in "ensuring [the] continuation" of "the local origination of [broadcast] programming," § 2(a)(10), an interest consistent with its larger purpose of promoting multiple types of media, § 2(a)(6), and found must-carry necessary "to serve the goals" of the original Communications Act of 1934 of "providing a fair, efficient, and equitable distribution of broadcast services," § 2(a)(9). In short, Congress enacted must-carry to "preserve the existing structure of the Nation's broadcast television medium while permitting the concomitant expansion and development of cable television." 512 U. S., at 652.

Although Congress set no definite number of broadcast stations sufficient for these purposes, the Cable Act's requirement that all cable operators with more than 12 channels set aside one-third of their channel capacity for local broadcasters, § 4, 47 U. S. C. § 534(b)(1)(B), refutes the notion that Congress contemplated preserving only a bare minimum of stations. Congress' evident interest in "preserv[ing] the existing structure," 512 U. S., at 652, of the broadcast industry discloses a purpose to prevent any significant reduction in the multiplicity of broadcast programming sources available to noncable households. To the extent the appellants question the substantiality of the Government's interest in preserving something more than a minimum number of stations in each community, their position is meritless. It is for Congress to decide how much local broadcast television should be preserved for noncable households, and the validity of its determination "'does not turn on a judge's agreement with the responsible decisionmaker concerning' . . . the degree to which [the Government's] interests should be promoted." *Ward*, 491 U. S., at 800 (quoting *United States* v.

*Albertini,* 472 U. S. 675, 689 (1985)); accord, *Clark* v. *Community for Creative Non-Violence,* 468 U..S. 288, 299 (1984) ("We do not believe . . . [that] *United States* v. *O'Brien* . . . endow[s] the judiciary with the competence to judge how much protection of park lands is wise").

The dissent proceeds on the assumption that must-carry is designed solely to be (and can only be justified as) a measure to protect broadcasters from cable operators' anticompetitive behavior. See *post,* at 251, 253, 258. Federal policy, however, has long favored preserving a multiplicity of broadcast outlets regardless of whether the conduct that threatens it is motivated by anticompetitive animus or rises to the level of an antitrust violation. See *Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S., at 714; *United States* v. *Midwest Video Corp., supra,* at 665 (plurality opinion) (FCC regulations "were . . . avowedly designed to guard broadcast services from being undermined by unregulated [cable] growth"); *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 223–224 (1943) (" 'While many of the network practices raise serious questions under the antitrust laws, . . . [i]t is not [the FCC's] function to apply the antitrust laws as such' " (quoting FCC Report on Chain Broadcasting Regulations (1941))). Broadcast television is an important source of information to many Americans. Though it is but one of many means for communication, by tradition and use for decades now it has been an essential part of the national discourse on subjects across the whole broad spectrum of speech, thought, and expression. See *Turner, supra,* at 663; *FCC* v. *National Citizens Comm. for Broadcasting,* 436 U. S. 775, 783 (1978) (referring to studies "showing the dominant role of television stations . . . as sources of local news and other information"). Congress has an independent interest in preserving a multiplicity of broadcasters to ensure that all households have access to information and entertainment on an equal footing with those who subscribe to cable.

A

On our earlier review, we were constrained by the state of the record to assessing the importance of the Government's asserted interests when "viewed in the abstract," *Turner*, 512 U. S., at 663. The expanded record now permits us to consider whether the must-carry provisions were designed to address a real harm, and whether those provisions will alleviate it in a material way. *Id.*, at 663–664. We turn first to the harm or risk which prompted Congress to act. The Government's assertion that "the economic health of local broadcasting is in genuine jeopardy and in need of the protections afforded by must-carry," *id.*, at 664–665, rests on two component propositions: First, "significant numbers of broadcast stations will be refused carriage on cable systems" absent must-carry, *id.*, at 666. Second, "the broadcast stations denied carriage will either deteriorate to a substantial degree or fail altogether." *Ibid.*

In reviewing the constitutionality of a statute, "courts must accord substantial deference to the predictive judgments of Congress." *Id.*, at 665. Our sole obligation is "to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." *Id.*, at 666. As noted in the first appeal, substantiality is to be measured in this context by a standard more deferential than we accord to judgments of an administrative agency. See *id.*, at 666–667; *id.*, at 670, n. 1 (STEVENS, J., concurring in part and concurring in judgment). We owe Congress' findings deference in part because the institution "is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon" legislative questions. *Turner*, *supra*, at 665–666 (plurality opinion) (quoting *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 331, n. 12 (1985)); *Ward*, *supra*, at 800; *Rostker* v. *Goldberg*, 453 U. S. 57, 83 (1981) (courts must perform "appropriately deferential examination of *Congress'* evaluation of th[e] evi-

dence"); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 103 (1973). This principle has special significance in cases, like this one, involving congressional judgments concerning regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change. Though different in degree, the deference to Congress is in one respect akin to deference owed to administrative agencies because of their expertise. See *FCC* v. *National Citizens Comm. for Broadcasting, supra,* at 814 ("[C]omplete factual support in the record for the [FCC's] judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency'"); *United States* v. *Midwest Video Corp.,* 406 U. S., at 674 (it was "beyond the competence of the Court of Appeals itself to assess the relative risks and benefits" of FCC policy, so long as that policy was based on findings supported by evidence). This is not the sum of the matter, however. We owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power. Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy.

1

We have no difficulty in finding a substantial basis to support Congress' conclusion that a real threat justified enactment of the must-carry provisions. We examine first the evidence before Congress and then the further evidence presented to the District Court on remand to supplement the congressional determination.

As to the evidence before Congress, there was specific support for its conclusion that cable operators had considerable and growing market power over local video programming markets. Cable served at least 60 percent of American households in 1992, see Cable Act § 2(a)(3), and evidence indicated cable market penetration was projected to grow beyond 70 percent. See Cable TV Consumer Protection Act of 1991: Hearing on S. 12 before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 102d Cong., 1st Sess., 259 (1991) (statement of Edward O. Fritts) (App. 1253); see also Defendants' Joint Statement of Evidence Before Congress ¶¶ 9, 10 (JSCR) (App. 1252–1253). As Congress noted, § 2(a)(2), cable operators possess a local monopoly over cable households. Only one percent of communities are served by more than one cable system, JSCR ¶¶ 31–40 (App. 1262–1266). Even in communities with two or more cable systems, in the typical case each system has a local monopoly over its subscribers. See Comments of NAB before the FCC on MM Docket No. 85–349, ¶ 47 (Apr. 25, 1986) (App. 26). Cable operators thus exercise "control over most (if not all) of the television programming that is channeled into the subscriber's home [and] can thus silence the voice of competing speakers with a mere flick of the switch." *Turner*, 512 U. S., at 656.

Evidence indicated the structure of the cable industry would give cable operators increasing ability and incentive to drop local broadcast stations from their systems, or reposition them to a less-viewed channel. Horizontal concentration was increasing as a small number of multiple system operators (MSO's) acquired large numbers of cable systems nationwide. § 2(a)(4). The trend was accelerating, giving the MSO's increasing market power. In 1985, the 10 largest MSO's controlled cable systems serving slightly less than 42 percent of all cable subscribers; by 1989, the figure was nearly 54 percent. JSCR ¶ 77 (App. 1282); Competitive

Problems in the Cable Television Industry, Hearing before the Subcommittee on Antitrust, Monopolies and Business Rights of the Senate Committee on the Judiciary, 101st Cong., 1st Sess., 74 (1990) (Hearing on Competitive Problems in the Cable Television Industry) (statement of Gene Kimmelman and Dr. Mark N. Cooper).

Vertical integration in the industry also was increasing. As Congress was aware, many MSO's owned or had affiliation agreements with cable programmers. § 2(a)(5); Senate Report, at 24–29. Evidence indicated that before 1984 cable operators had equity interests in 38 percent of cable programming networks. In the late 1980's, 64 percent of new cable programmers were held in vertical ownership. JSCR ¶ 197 (App. 1332–1333). Congress concluded that "vertical integration gives cable operators the incentive and ability to favor their affiliated programming services," § 2(a)(5); Senate Report, at 25, a conclusion that even Judge Williams' dissent conceded to be reasonable. See 910 F. Supp., at 775. Extensive testimony indicated that cable operators would have an incentive to drop local broadcasters and to favor affiliated programmers. See, e. g., Competitive Issues in the Cable Television Industry: Hearing before the Subcommittee on Antitrust, Monopolies and Business Rights of the Senate Committee on the Judiciary, 100th Cong., 2d Sess., 546 (1988) (Hearing on Competitive Issues) (statement of Milton Maltz); Cable Television Regulation: Hearings on H. R. 1303 and H. R. 2546 before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 102d Cong., 1st Sess., 869–870, 878–879 (1992) (Hearings on Cable Television Regulation) (statement of James B. Hedlund); id., at 752 (statement of Edward O. Fritts); id., at 699 (statement of Gene Kimmelman); Cable Television Regulation (Part 2): Hearings before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 101st Cong., 2d Sess., 261 (1990) (Hearings on Cable Television Regulation (Part 2)) (state-

ment of Robert G. Picard) (App. 1339–1341); see also JSCR ¶¶ 168–170, 278–280 (App. 1320–1321, 1370–1371).

Though the dissent criticizes our reliance on evidence provided to Congress by parties that are private appellees here, *post*, at 237–238, that argument displays a lack of regard for Congress' factfinding function. It is the nature of the legislative process to consider the submissions of the parties most affected by legislation. Appellants, too, sent representatives before Congress to try to persuade them of their side of the debate. See, *e. g.*, Hearing on Competitive Problems in the Cable Television Industry, at 228–241 (statement of James P. Mooney, president and CEO of appellant NCTA); Hearings on Cable Television Regulation, at 575–582 (statement of Decker S. Anstrom, executive vice president of appellant NCTA); Cable TV Consumer Protection Act of 1991: Hearing on S. 12 before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 102d Cong., 1st Sess., 173–180 (1991) (statement of Ted Turner, president of appellant Turner Broadcasting System). After hearing years of testimony, and reviewing volumes of documentary evidence and studies offered by both sides, Congress concluded that the cable industry posed a threat to broadcast television. The Constitution gives to Congress the role of weighing conflicting evidence in the legislative process. Even when the resulting regulation touches on First Amendment concerns, we must give considerable deference, in examining the evidence, to Congress' findings and conclusions, including its findings and conclusions with respect to conflicting economic predictions. See *supra*, at 195–196. Furthermore, much of the testimony, though offered by interested parties, was supported by verifiable information and citation to independent sources. See, *e. g.*, Hearings on Cable Television Regulation, at 869–870, 878–879 (statement of James B. Hedlund); *id.*, at 705, 707–708, 712 (statement of Gene Kimmelman).

The reasonableness of Congress' conclusion was borne out by the evidence on remand, which also reflected cable industry favoritism for integrated programmers. See, e. g., Record, Defendants' Additional Evidence, Vol. VII.H, Exh. 170, p. 1749 (DAE) (cable industry memo stating: "All [of an MSO's] systems must launch Starz [an integrated programmer] 2/94. Word from corporate: if you don't have free channels . . . make one free"); Third Declaration of Tom Meek ¶ 44 (Third Meek Declaration) (App. 2071–2072); see also Declaration of Roger G. Noll ¶¶ 18–22 (Noll Declaration) (App. 1009–1013); Declaration of James Dertouzos ¶ 6a (Dertouzos Declaration) (App. 959).

In addition, evidence before Congress, supplemented on remand, indicated that cable systems would have incentives to drop local broadcasters in favor of other programmers less likely to compete with them for audience and advertisers. Independent local broadcasters tend to be the closest substitutes for cable programs, because their programming tends to be similar, see JSCR ¶¶ 269, 274, 276 (App. 1367, 1368–1370), and because both primarily target the same type of advertiser: those interested in cheaper (and more frequent) ad spots than are typically available on network affiliates. Second Declaration of Tom Meek ¶ 32 (Second Meek Declaration) (App. 1866); Reply Declaration of James N. Dertouzos ¶ 26 (App. 2023); Carriage of Television Broadcast Signals by Cable Television Systems, Reply Comment of the Staff of the Bureau of Economics and the San Francisco Regional Office of the Federal Trade Commission, p. 19 (Nov. 26, 1991) (Reply Comment of FTC) (App. 176). The ability of broadcast stations to compete for advertising is greatly increased by cable carriage, which increases viewership substantially. See Second Meek Declaration ¶ 34 (App. 1866–1867). With expanded viewership, broadcast presents a more competitive medium for television advertising. Empirical studies indicate that cable-carried broadcasters so enhance competition for advertising that even modest increases in the numbers of

broadcast stations carried on cable are correlated with sig-. nificant decreases in advertising revenue to cable systems. Dertouzos Declaration ¶¶ 20, 25–28 (App. 966, 969–971); see also Reply Comment of FTC, at 18 (App. 175). Empirical evidence also indicates that demand for premium cable services (such as pay-per-view) is reduced when a cable system carries more independent broadcasters. Hearing on Competitive Problems in the Cable Television Industry, at 323 (statement of Michael O. Wirth). Thus, operators stand to benefit by dropping broadcast stations. Dertouzos Declaration ¶ 6b (App. 959).

Cable systems also have more systemic reasons for seeking to disadvantage broadcast stations: Simply stated, cable has little interest in assisting, through carriage, a competing medium of communication. As one cable-industry executive put it, " 'our job is to promote cable television, not broadcast television.' " Hearing on Competitive Issues, at 658 (quoting Multichannel News, Channel Realignments: United Cable Eyes Plan to Bump Network Affils to Upper Channels, Nov. 3, 1986, p. 39); see also Hearing on Competitive Issues, at 661 (" 'Shouldn't we give more . . . shelf space to cable? Why have people trained to view UHF?' ") (vice president of operations at Comcast, an MSO, quoted in Multichannel News, Cable Operators begin to Shuffle Channel Lineups, Sept. 8, 1986, p. 38). The incentive to subscribe to cable is lower in markets with many over-the-air viewing options. See JSCR ¶ 275 (App. 1369); Dertouzos Declaration ¶¶ 27, 32 (App. 970, 972). Evidence adduced on remand indicated cable systems have little incentive to carry, and a significant incentive to drop, broadcast stations that will only be strengthened by access to the 60 percent of the television market that cable typically controls. Dertouzos Declaration ¶¶ 29, 35 (App. 971, 973); Noll Declaration ¶ 43 (App. 1029). Congress could therefore reasonably conclude that cable systems would drop broadcasters in favor of programmers— even unaffiliated ones—less likely to compete with them for

audience and advertisers. The cap on carriage of affiliates included in the Cable Act, 47 U. S. C. § 533(f)(1)(B); 47 CFR § 76.504 (1995), and relied on by the dissent, *post*, at 238, 252, is of limited utility in protecting broadcasters.

The dissent contends Congress could not reasonably conclude cable systems would engage in such predation because cable operators, whose primary source of revenue is subscriptions, would not risk dropping a widely viewed broadcast station in order to capture advertising revenues. *Post*, at 239. However, if viewers are faced with the choice of sacrificing a handful of broadcast stations to gain access to dozens of cable channels (plus network affiliates), it is likely they would still subscribe to cable even if they would prefer the dropped television stations to the cable programming that replaced them. Substantial evidence introduced on remand bears this out: With the exception of a handful of very popular broadcast stations (typically network affiliates), a cable system's choice between carrying a cable programmer or broadcast station has little or no effect on cable subscriptions, and subscribership thus typically does not bear on carriage decisions. Noll Declaration ¶ 29 (App. 1018–1019); Rebuttal Declaration of Roger G. Noll ¶ 20 (App. 1798); Reply Declaration of Roger G. Noll ¶¶ 3–4, and n. 3 (App. 2003–2004); see also Declaration of John R. Haring ¶ 37 (Haring Declaration) (App. 1106).

It was more than a theoretical possibility in 1992 that cable operators would take actions adverse to local broadcasters; indeed, significant numbers of broadcasters had already been dropped. The record before Congress contained extensive anecdotal evidence about scores of adverse carriage decisions against broadcast stations. See JSCR ¶¶ 291–467, 664 (App. 1376–1489, 1579). Congress considered an FCC-sponsored study detailing cable system carriage practices in the wake of decisions by the United States Court of Appeals for the District of Columbia Circuit striking down prior must-carry regulations. See *Quincy Cable TV, Inc.* v. *FCC*, 768 F. 2d

1434 (1985), cert. denied, 476 U. S. 1169 (1986); *Century Communications Corp.* v. *FCC*, 835 F. 2d 292 (1987), cert. denied, 486 U. S. 1032 (1988). It indicated that in 1988, 280 out of 912 responding broadcast stations had been dropped or denied carriage in 1,533 instances. App. 47. Even assuming that every station dropped or denied coverage responded to the survey, it would indicate that nearly a quarter (21 percent) of the approximately 1,356 broadcast stations then in existence, *id.*, at 40, had been denied carriage. The same study reported 869 of 4,303 reporting cable systems had denied carriage to 704 broadcast stations in 1,820 instances, *id.*, at 48, and 279 of those stations had qualified for carriage under the prior must-carry rules, *id.*, at 49. A contemporaneous study of public television stations indicated that in the vast majority of cases, dropped stations were not restored to the cable service. Record, CR Vol. I.Z, Exh. 140, pp. CR 15297–15298, 15306–15307.

Substantial evidence demonstrated that absent must-carry the already "serious," Senate Report, at 43, problem of noncarriage would grow worse because "additional local broadcast signals will be deleted, repositioned, or not carried," § 2(a)(15). The record included anecdotal evidence showing the cable industry was acting with restraint in dropping broadcast stations in an effort to discourage reregulation. See Hearings on Cable Television Regulation, at 900, n. 81 (statement of James B. Hedlund); Hearings on Cable Television Regulation (Part 2), at 242–243 (statement of James P. Mooney) (App. 1519); JSCR ¶¶ 524–534 (App. 1515–1519). There was also substantial evidence that advertising revenue would be of increasing importance to cable operators as subscribership growth began to flatten, providing a steady, increasing incentive to deny carriage to local broadcasters in an effort to capture their advertising revenue. *Id.*, ¶¶ 124–142, 154–166 (App. 1301–1308, 1313–1319). A contemporaneous FCC report noted that "[c]able operators' incentive to deny carriage . . . appears to be particularly great as against

local broadcasters." *Id.*, ¶ 155 (App. 1313). FCC Commissioner James Quello warned Congress that the carriage problems "occurring today are just the 'tip of the iceberg.' These activities come at a time when the cable industry is just beginning to recognize the importance of local advertising." Cable Television, Hearings before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 100th Cong., 2d Sess., 322 (1988) (App. 1515). Quello continued: "As [cable] systems mature and penetration levels off, systems will turn increasingly to advertising for revenues. The incentive to deny carriage to local stations is a logical, rational and, without must carry, a legal business strategy." App. A to Testimony of James B. Hedlund before the Subcommittee on Telecommunications and Finance of the House Committee on Energy & Commerce 18 (1990) (statement of James H. Quello) (App. 1315). The FCC advised Congress the "diversity in broadcast television service . . . will be jeopardized if this situation continues unredressed." *In re Competition, Rate Regulation, and Provision of Cable Television Service*, 5 FCC Rcd 4962, 5040, ¶ 149 (1990).

Additional evidence developed on remand supports the reasonableness of Congress' predictive judgment. Approximately 11 percent of local broadcasters were not carried on the typical cable system in 1989. See Reply Comment of FTC, at 9–10 (App. 168–169). The figure had grown to even more significant proportions by 1992. According to one of appellants' own experts, between 19 and 31 percent of all local broadcast stations, including network affiliates, were not carried by the typical cable system. See Declaration of Stanley Besen, Exhs. C–2, C–3 (App. 907–908). Based on the same data, another expert concluded that 47 percent of local independent commercial stations, and 36 percent of noncommercial stations, were not carried by the typical cable system. The rate of noncarriage was even higher for new stations. Third Meek Declaration ¶ 4 (App. 2054). Appel-

lees introduced evidence drawn from an empirical study concluding the 1988 FCC survey substantially underestimated the actual number of drops (Declaration of Tom Meek ¶¶ 5, 25, 36 (Meek Declaration) (App. 619, 625, 626)), and the noncarriage problem grew steadily worse during the period without must-carry. By the time the Cable Act was passed, 1,261 broadcast stations had been dropped for at least one year, in a total of 7,945 incidents. *Id.,* ¶¶ 12, 15 (App. 621, 622).

The dissent cites evidence indicating that many dropped broadcasters were stations few viewers watch, *post,* at 242, and it suggests that must-carry thwarts noncable viewers' preferences, *ibid.* Undoubtedly, viewers without cable—the immediate, though not sole, beneficiaries of efforts to preserve broadcast television—would have a strong preference for carriage of any broadcast program over any cable program, for the simple reason that it helps to preserve a medium to which they have access. The methodological flaws in the cited evidence are of concern. See *post,* at 243. Even aside from that, the evidence overlooks that the broadcasters added by must-carry had ratings greater than or equal to the cable programs they replaced. Second Meek Declaration ¶ 23 (App. 1863) (ratings of broadcasters added by must-carry "are generally higher than that achieved . . . by their equivalent cable counterparts"); Meek Declaration ¶ 21, at 11–12 (Record, DAE Vol. II.A, Exh. 2); see also Hearings on Cable Television Regulation, at 880 (statement of James Hedlund) ("[I]n virtually every instance, the local [broadcast] stations shifted are more popular . . . than the cable program services that replace them"); JSCR ¶¶ 497–510 (App. 1505–1509) (stations dropped before must-carry generally more popular than cable services that replaced them). (Indeed, in the vast majority of cases, cable systems were able to fulfill their must-carry obligations using spare channels, and did not displace cable programmers. See Report to Counsel for National Cable Television Association Carriage of Must-

Carry TV Broadcast Stations, Table II–4 (Apr. 1995) (App. 678).) On average, even the lowest rated station added pursuant to must-carry had ratings better than or equal to at least nine basic cable program services carried on the system. Third Meek Declaration ¶ 20, and n. 5 (App. 2061). If cable systems refused to carry certain local broadcast stations because of their subscribers' preferences for the cable services carried in their place, one would expect that all cable programming services would have ratings exceeding those of broadcasters not carried. That is simply not the case.

The evidence on remand also indicated that the growth of cable systems' market power proceeded apace. The trend toward greater horizontal concentration continued, driven by "[e]nhanced growth prospects for advertising sales." Paul Kagan Assocs., Inc., Cable TV Advertising 1 (Sept. 30, 1994) (App. 301). By 1994, the 10 largest MSO's controlled 63 percent of cable systems, Notice of Inquiry, *In re Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming*, 10 FCC Rcd 7805, 7819–7820, ¶ 79 (1995), a figure projected to have risen to 85 percent by the end of 1996. DAE Vol. VII.D, Exh. 80, at 1 (Turner Broadcasting memo); Noll Declaration ¶ 26 (App. 1017). MSO's began to gain control of as many cable systems in a given market as they could, in a trend known as "clustering." JSCR ¶¶ 150–153 (App. 1311–1313). Cable systems looked increasingly to advertising (and especially local advertising) for revenue growth, see, *e. g.*, Paul Kagan Associates, Inc., Cable TV Advertising 1 (July 28, 1993) (App. 251); 1 R. Bilotti, D. Hansen, & R. MacDonald, The Cable Television Industry 94–97 (Mar. 8, 1993) (DAE Vol. VII.K, Exh. 232, at 94–97) ("Local advertising revenue is an exceptional incremental revenue opportunity for the cable television industry"); Memo from Arts & Entertainment Network, dated Oct. 26, 1992, p. 2 (DAE Vol. VII.K, Exh. 235) (discussing "huge growth on the horizon" for spot adver-

tising revenue), and cable systems had increasing incentives to drop local broadcasters in favor of cable programmers (whether affiliated or not). See Noll Declaration ¶¶ 29–31 (App. 1018–1020). The vertical integration of the cable industry also continued, so by 1994, MSO's serving about 70 percent of the Nation's cable subscribers held equity interests in cable programmers. See *In re Implementation of Section 19 of Cable Television Protection and Competition Act of 1992, First Report,* 9 FCC Rcd 7442, 7526, ¶ 167, and nn. 455, 457 (1994); *id.,* App. G, Tables 9–10; Top 100 MSO's as of October 1, 1994 (DAE Vol. VII.K, Exh. 266); see also JSCR ¶¶ 199, 204 (App. 1334, 1336). The FTC study the dissent cites, *post,* at 242, takes a skeptical view of the potential for cable systems to engage in anticompetitive behavior, but concedes the risk of anticompetitive carriage denials is "most plausible" when "the cable system's franchise area is large relative to the local area served by the affected broadcast station," Reply Comment of FTC, at 20 (App. 177), and when "a system's penetration rate is both high and relatively unresponsive to the system's carriage decisions," *id.,* at 18 (App. 175). That describes "precisely what is happening" as large cable operators expand their control over individual markets through clustering. Second Meek Declaration ¶ 35 (App. 1867). As they do so, they are better able to sell their own reach to potential advertisers, and to limit the access of broadcast competitors by denying them access to all or substantially all the cable homes in the market area. *Ibid.;* accord, Noll Declaration ¶ 24 (App. 1015).

This is not a case in which we are called upon to give our best judgment as to the likely economic consequences of certain financial arrangements or business structures, or to assess competing economic theories and predictive judgments, as we would in a case arising, say, under the antitrust laws. "Statutes frequently require courts to make policy judgments. The Sherman Act, for example, requires courts to delve deeply into the theory of economic organization."

See *Holder* v. *Hall*, 512 U. S. 874, 966 (1994) (separate opinion of STEVENS, J.). The issue before us is whether, given conflicting views of the probable development of the television industry, Congress had substantial evidence for making the judgment that it did. We need not put our imprimatur on Congress' economic theory in order to validate the reasonableness of its judgment.

### 2

The harm Congress feared was that stations dropped or denied carriage would be at a "serious risk of financial difficulty," 512 U. S., at 667, and would "deteriorate to a substantial degree or fail altogether," *id.*, at 666. Congress had before it substantial evidence to support its conclusion. Congress was advised the viability of a broadcast station depends to a material extent on its ability to secure cable carriage. JSCR ¶¶ 597–617, 667–670, 673 (App. 1544–1553, 1580–1581, 1582–1583). One broadcast industry executive explained it this way:

> "Simply put, a television station's audience size directly translates into revenue—large audiences attract larger revenues, through the sale of advertising time. If a station is not carried on cable, and thereby loses a substantial portion of its audience, it will lose revenue. With less revenue, the station can not serve its community as well. The station will have less money to invest in equipment and programming. The attractiveness of its programming will lessen, as will its audience. Revenues will continue to decline, and the cycle will repeat." Hearing on Competitive Issues, at 526–527 (statement of Gary Chapman) (App. 1600).

See also JSCR ¶¶ 589–591 (App. 1542–1543); *id.*, ¶¶ 625–633, 636, 638–640 (App. 1555–1563) (repositioning). Empirical research in the record before Congress confirmed the "'direct correlation [between] size in audience and station [ad-

vertising] revenues,'" *id.*, ¶ 591 (App. 1543), and that viewership was in turn heavily dependent on cable carriage, see *id.*, ¶¶ 589–596 (App. 1542–1544).

Considerable evidence, consisting of statements compiled from dozens of broadcasters who testified before Congress and the FCC, confirmed that broadcast stations had fallen into bankruptcy, see *id.*, ¶¶ 659, 661, 669, 671–672, 676, 681 (App. 1576, 1578, 1581–1582, 1584, 1587), curtailed their broadcast operations, see *id.*, ¶¶ 589, 692, 695, 697, 703–704 (App. 1542, 1591–1600), and suffered serious reductions in operating revenues as a result of adverse carriage decisions by cable systems, see *id.*, ¶¶ 618–620, 622–623 (App. 1553–1555). The record also reflected substantial evidence that stations without cable carriage encountered severe difficulties obtaining financing for operations, reflecting the financial markets' judgment that the prospects are poor for broadcasters unable to secure carriage. See, *e. g., id.*, ¶¶ 302, 304, 581, 643–658 (App. 1382–1383, 1538–1539, 1564–1576); see also Declaration of David Schutz ¶¶ 6, 15–16, 18, 43 (App. 640–641, 644–646, 654); Noll Declaration ¶¶ 36–42 (App. 1024–1029); Haring Declaration ¶¶ 21–26 (App. 1099–1102); Second Meek Declaration ¶ 11 (App. 1858); Declaration of Jeffrey Rohlfs ¶ 6 (App. 1157–1158). Evidence before Congress suggested the potential adverse impact of losing carriage was increasing as the growth of clustering gave MSO's centralized control over more local markets. See JSCR ¶¶ 150–153 (App. 1311–1313). Congress thus had ample basis to conclude that attaining cable carriage would be of increasing importance to ensuring a station's viability. We hold Congress could conclude from the substantial body of evidence before it that "absent legislative action, the free local off-air broadcast system is endangered." Senate Report, at 42.

The evidence assembled on remand confirms the reasonableness of the congressional judgment. Documents produced on remand reflect that internal cable industry studies

"clearly establis[h] the importance of cable television to broadcast television stations. Because viewership equates to ratings and in turn ratings equate to revenues, it is unlikely that broadcast stations could afford to be off the cable system's line-up for any extended period of time." Memorandum from F. Lopez to T. Baxter re: Adlink's Presentations on Retransmission Consent, dated June 14, 1993 (App. 2118).

Another study prepared by a large MSO in 1993 concluded that "[w]ith cable penetration now exceeding 70% in many markets, the ability of a broadcast television station to easily reach its audience through cable television is crucial." Exh. B to Haring Declaration, DAE Vol. II.A (App. 2147). The study acknowledged that even in a market with significantly below-average cable penetration, "[t]he loss of cable carriage could cause a significant decrease in a station's ratings and a resulting loss in advertising revenues." *Ibid.* (App. 2147). For an average market "the impact would be even greater." *Ibid.* (App. 2149). The study determined that for a popular station in a major television market, even modest reductions in carriage could result in sizeable reductions in revenue. A 5 percent reduction in cable viewers, for example, would result in a $1.48 million reduction in gross revenue for the station. (App. 2156.)

To be sure, the record also contains evidence to support a contrary conclusion. Appellants (and the dissent in the District Court) make much of the fact that the number of broadcast stations and their advertising revenue continued to grow during the period without must-carry, albeit at a diminished rate. Evidence introduced on remand indicated that only 31 broadcast stations actually went dark during the period without must-carry (one of which failed after a tornado destroyed its transmitter), and during the same period some 263 new stations signed on the air. Meek Declaration ¶¶ 76–77 (App. 627–628). New evidence appellants produced on remand indicates the average cable system volun-

tarily carried local broadcast stations accounting for about 97 percent of television ratings in noncable households. Declaration of Stanley Besen, Part III–D (App. 808). Appellants, as well as the dissent in the District Court, contend that in light of such evidence, it is clear "the must-carry law is not necessary to assure the economic viability of the broadcast system as a whole." NCTA Brief 18.

This assertion misapprehends the relevant inquiry. The question is not whether Congress, as an objective matter, was correct to determine must-carry is necessary to prevent a substantial number of broadcast stations from losing cable carriage and suffering significant financial hardship. Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress. *Turner*, 512 U. S., at 665–666. In making that determination, we are not to "reweigh the evidence *de novo*, or to replace Congress' factual predictions with our own." *Id.*, at 666. Rather, we are simply to determine if the standard is satisfied. If it is, summary judgment for defendants-appellees is appropriate regardless of whether the evidence is in conflict. We have noted in another context, involving less deferential review than is at issue here, that " 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent . . . [a] finding from being supported by substantial evidence.' " *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 523 (1981) (citation omitted) (quoting *Consolo* v. *Federal Maritime Comm'n*, 383 U. S. 607, 620 (1966)).

Although evidence of continuing growth in broadcast could have supported the opposite conclusion, a reasonable interpretation is that expansion in the cable industry was causing harm to broadcasting. Growth continued, but the rate of growth fell to a considerable extent during the period without must-carry (from 4.5 percent in 1986 to 1.7 percent by 1992), and appeared to be tapering off further. JSCR ¶¶ 577–584 (App. 1537–1540); Meek Declaration ¶¶ 74–82

(App. 626–631); 910 F. Supp., at 790, App. 2. At the same time, "in an almost unprecedented development," 5 FCC Rcd, at 5041, ¶¶ 153–154, stations began to fail in increasing numbers. Meek Declaration ¶ 78 (App. 628) ("[T]he number of stations going dark began to escalate" after 1988) (emphasis deleted); JSCR ¶¶ 659, 661, 669, 671–672, 676, 681 (App. 1576, 1581–1582, 1584, 1587). Broadcast advertising revenues declined in real terms by 11 percent between 1986 and 1991, during a period in which cable's real advertising revenues nearly doubled. See 910 F. Supp., at 790, App. 1. While these phenomena could be thought to stem from factors quite separate from the increasing market power of cable (for example, a recession in 1990–1992), it was for Congress to determine the better explanation. We are not at liberty to substitute our judgment for the reasonable conclusion of a legislative body. See *Turner, supra*, at 665–666. It is true the number of bankruptcies among local broadcasters was small; but Congress could forecast continuance of the "unprecedented" 5-year downward trend and conclude the station failures of 1985–1992 were, as Commissioner Quello warned, the tip of the iceberg. A fundamental principle of legislation is that Congress is under no obligation to wait until the entire harm occurs but may act to prevent it. "An industry need not be in its death throes before Congress may act to protect it from economic harm threatened by a monopoly." *Turner, supra*, at 672 (STEVENS, J., concurring in part and concurring in judgment). As a Senate Committee noted in a Report on the Cable Act: "[W]e need not wait until widespread further harm has occurred to the system of local broadcasting or to competition in the video market before taking action to forestall such consequences. Congress is allowed to make a rational predication of the consequences of inaction and of the effects of regulation in furthering governmental interests." Senate Report, at 60.

Despite the considerable evidence before Congress and adduced on remand indicating that the significant numbers of

broadcast stations are at risk, the dissent believes yet more is required before Congress could act. It demands more information about which of the dropped broadcast stations still qualify for mandatory carriage, *post,* at 241; about the broadcast markets in which adverse decisions take place, *ibid.;* and about the features of the markets in which bankrupt broadcast stations were located prior to their demise, *post,* at 246. The level of detail in factfinding required by the dissent would be an improper burden for courts to impose on the Legislative Branch. That amount of detail is as unreasonable in the legislative context as it is constitutionally unwarranted. "Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner, supra,* at 666 (plurality opinion).

We think it apparent must-carry serves the Government's interests "in a direct and effective way." *Ward,* 491 U. S., at 800. Must-carry ensures that a number of local broadcasters retain cable carriage, with the concomitant audience access and advertising revenues needed to support a multiplicity of stations. Appellants contend that even were this so, must-carry is broader than necessary to accomplish its goals. We turn to this question.

### B

The second portion of the *O'Brien* inquiry concerns the fit between the asserted interests and the means chosen to advance them. Content-neutral regulations do not pose the same "inherent dangers to free expression," *Turner, supra,* at 661, that content-based regulations do, and thus are subject to a less rigorous analysis, which affords the Government latitude in designing a regulatory solution. See, *e. g., Ward, supra,* at 798–799, n. 6. Under intermediate scrutiny, the Government may employ the means of its choosing " 'so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent

the regulation,'" and does not "'burden substantially more speech than is necessary to further'" that interest. *Turner*, 512 U. S., at 662 (quoting *Ward*, *supra*, at 799).

The must-carry provisions have the potential to interfere with protected speech in two ways. First, the provisions restrain cable operators' editorial discretion in creating programming packages by "reduc[ing] the number of channels over which [they] exercise unfettered control." *Turner*, 512 U. S., at 637. Second, the rules "render it more difficult for cable programmers to compete for carriage on the limited channels remaining." *Ibid.*

Appellants say the burden of must-carry is great, but the evidence adduced on remand indicates the actual effects are modest. Significant evidence indicates the vast majority of cable operators have not been affected in a significant manner by must-carry. Cable operators have been able to satisfy their must-carry obligations 87 percent of the time using previously unused channel capacity, Declaration of Harry Shooshan III, ¶ 14 (App. 692); 94.5 percent of the 11,628 cable systems nationwide have not had to drop any programming in order to fulfill their must-carry obligations; the remaining 5.5 percent have had to drop an average of only 1.22 services from their programming, *id.*, ¶ 15 (App. 692); and cable operators nationwide carry 99.8 percent of the programming they carried before enactment of must-carry, *id.*, ¶ 21 (App. 694–695). Appellees note that only 1.18 percent of the approximately 500,000 cable channels nationwide is devoted to channels added because of must-carry, see *id.*, ¶ 11(b) (App. 688–689); weighted for subscribership, the figure is 2.4 percent, 910 F. Supp., at 780 (Williams, J., dissenting). Appellees contend the burdens of must-carry will soon diminish as cable channel capacity increases, as is occurring nationwide. NAB Brief 45; see also 910 F. Supp., at 746–747.

We do not understand appellants to dispute in any fundamental way the accuracy of those figures, only their significance. See NCTA Brief 46; *id.*, at 44–49; Time Warner Brief

38–45; Turner Brief 33–42. They note national averages fail to account for greater crowding on certain (especially urban) cable systems, see Time Warner Brief 41, 43; Turner Brief 41, and contend that half of all cable systems, serving two-thirds of all cable subscribers, have no available capacity, NCTA Brief 45; Turner Brief 34; Time Warner Brief 42, n. 58. Appellants argue that the rate of growth in cable programming outstrips cable operators' creation of new channel space, that the rate of cable growth is lower than claimed, Turner Brief 39, and that must-carry infringes First Amendment rights now irrespective of future growth, Turner Brief 40; Reply Brief for Appellants Turner Broadcasting System, Inc., et al. 12–13. Finally, they say that regardless of the percentage of channels occupied, must-carry still represents "thousands of real and individual infringements of speech." Time Warner Brief 44.

While the parties' evidence is susceptible of varying interpretations, a few definite conclusions can be drawn about the burdens of must-carry. It is undisputed that broadcast stations gained carriage on 5,880 channels as a result of must-carry. While broadcast stations occupy another 30,006 cable channels nationwide, this carriage does not represent a significant First Amendment harm to either system operators or cable programmers because those stations were carried voluntarily before 1992, and even appellants represent, Tr. of Oral Arg. 6, that the vast majority of those channels would continue to be carried in the absence of any legal obligation to do so. See Turner, supra, at 673, n. 6 (STEVENS, J., concurring in part and concurring in judgment). The 5,880 channels occupied by added broadcasters represent the actual burden of the regulatory scheme. Appellants concede most of those stations would be dropped in the absence of must-carry, Tr. of Oral Arg. 6, so the figure approximates the benefits of must-carry as well.

Because the burden imposed by must-carry is congruent to the benefits it affords, we conclude must-carry is narrowly

tailored to preserve a multiplicity of broadcast stations for the 40 percent of American households without cable. Cf. *Ward*, 491 U. S., at 799, n. 7 ("[T]he essence of narrow tailoring" is "focus[ing] on the source of the evils the [Government] seeks to eliminate [without] significantly restricting a substantial quantity of speech that does not create the same evils"); *Community for Creative Non-Violence*, 468 U. S., at 297 ("None of [the regulation's] provisions appears unrelated to the ends that it was designed to serve"). Congress took steps to confine the breadth and burden of the regulatory scheme. For example, the more popular stations (which appellants concede would be carried anyway) will likely opt to be paid for cable carriage under the "retransmission consent" provision of the Cable Act; those stations will nonetheless be counted toward systems' must-carry obligations. Congress exempted systems of 12 or fewer channels, and limited the must-carry obligation of larger systems to one-third of capacity, 47 U. S. C. § 534(b)(1); see also §§ 535(b)(2)–(3); allowed cable operators discretion in choosing which competing and qualified signals would be carried, § 534(b)(2); and permitted operators to carry public stations on unused public, educational, and governmental channels in some circumstances, § 535(d).

Appellants say the must-carry provisions are overbroad because they require carriage in some instances when the Government's interests are not implicated: The must-carry rules prohibit a cable system operator from dropping a broadcaster "even if the operator has no anticompetitive motives, and even if the broadcaster that would have to be dropped . . . would survive without cable access." 512 U. S., at 683 (O'CONNOR, J., dissenting). See also NCTA Brief 25–26. We are not persuaded that either possibility is so prevalent that must-carry is substantially overbroad. As discussed *supra*, at 201–202, cable systems serving 70 percent of subscribers are vertically integrated with cable programmers, so anticompetitive motives may be implicated in a

majority of systems' decisions not to carry broadcasters. Some broadcasters will opt for must-carry although they would not suffer serious financial harm in its absence. See Time Warner Brief 35–36, and n. 49. Broadcasters with stronger finances tend, however, to be popular ones that ordinarily seek payment from cable systems for transmission, so their reliance on must-carry should be minimal. It appears, for example, that no more than a few hundred of the 500,000 cable channels nationwide are occupied by network affiliates opting for must-carry, see Time Warner Brief 35–36, and n. 49, a number insufficient to render must-carry "substantially broader than necessary to achieve the government's interest," *Ward, supra,* at 800. Even on the doubtful assumption that a narrower but still practicable must-carry rule could be drafted to exclude all instances in which the Government's interests are not implicated, our cases establish that content-neutral regulations are not "invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Albertini,* 472 U. S., at 689; accord, *Ward, supra,* at 797; *Community for Creative Non-Violence, supra,* at 299.

Appellants posit a number of alternatives in an effort to demonstrate a less restrictive means to achieve the Government's aims. They ask us, in effect, to "sif[t] through all the available or imagined alternative means of regulating [cable television] in order to determine whether the [Government's] solution was 'the least intrusive means' of achieving the desired end," an approach we rejected in *Ward,* 491 U. S., at 797. This " 'less-restrictive-alternative analysis . . . has never been a part of the inquiry into the validity' " of content-neutral regulations on speech. *Ibid.* (quoting *Regan v. Time, Inc.,* 468 U. S. 641, 657 (1984) (plurality opinion) (ellipses in original)). Our precedents establish that when evaluating a content-neutral regulation which incidentally burdens speech, we will not invalidate the preferred remedial scheme because some alternative solution is marginally

less intrusive on a speaker's First Amendment interests. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U. S., at 800. See generally *ibid.* (holding regulation valid although Court of Appeals had identified less restrictive "alternative regulatory methods" of controlling volume at concerts); *Albertini, supra,* at 689 (upholding validity of order barring a person from a military base, although excluding barred person was not "essential" to preserving security and there were less speech-restrictive means of attaining that end); *Community for Creative Non-Violence, supra,* at 299 (overnight camping ban upheld although "there [were] less speech-restrictive alternatives" of satisfying interest in preserving park lands); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 815–817 (1984) (stating that although making exceptions to ban on posting signs on public property "would have had a less severe effect on expressive activity," they were not "constitutionally mandated"). It is well established a regulation's validity "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." *Albertini, supra,* at 689.

In any event, after careful examination of each of the alternatives suggested by appellants, we cannot conclude that any of them is an adequate alternative to must-carry for promoting the Government's legitimate interests. First among appellants' suggested alternatives is a proposal to revive a more limited set of must-carry rules, known as the *"Century* rules" after the 1987 court decision striking them down, see *Century Communications Corp.* v. *FCC,* 835 F. 2d 292 (CADC). Those rules included a minimum viewership standard for eligibility and limited the must-carry obligation

to 25 percent of channel capacity. The parties agree only 14 percent of broadcasters added to cable systems under the Cable Act would be eligible for carriage under the *Century* rules. See Turner Brief 45; Brief for Federal Appellees 45; NAB Brief 49; see also Declaration of Gregory Klein ¶¶ 21–25 (App. 1141–1143). The *Century* rules, for the most part, would require carriage of the same stations a system would carry without statutory compulsion. While we acknowledge appellants' criticism of any rationale that more is better, the scheme in question does not place limitless must-carry obligations on cable system operators. In the final analysis this alternative represents nothing more than appellants' " '[dis]agreement with the responsible decisionmaker concerning' . . . the degree to which [the Government's] interests should be promoted." *Ward, supra,* at 800 (quoting *Albertini, supra,* at 689); *Community for Creative Non-Violence,* 468 U. S., at 299. Congress legislated in the shadow of *Quincy Cable TV, Inc.* v. *FCC,* 768 F. 2d 1434 (CADC 1985), and *Century Communications.* Its deliberations reflect awareness of the must-carry rules at issue in those cases, Senate Report, at 39–41, 62; indeed, in drafting the must-carry provisions of the Cable Act, Congress made specific comparisons to the rules struck down in *Quincy, supra.* See House Report, at 65–66; Senate Report, at 61. The record reflects a deliberate congressional choice to adopt the present levels of protection, to which this Court must defer.

The second alternative appellants urge is the use of input selector or "A/B" switches, which, in combination with antennas, would permit viewers to switch between cable and broadcast input, allowing cable subscribers to watch broadcast programs not carried on cable. Congress examined the use of A/B switches as an alternative to must-carry and concluded it was "not an enduring or feasible method of distribution and . . . not in the public interest." § 2(a)(18). The data showed that: many households lacked adequate antennas to

receive broadcast signals, JSCR ¶¶ 724, 725, 768 (App. 1609–1610, 1634); A/B switches suffered from technical flaws, *id.*, ¶¶ 718, 721, 738–739, 751–755, 761 (App. 1606, 1608, 1617–1618, 1624–1626, 1630); viewers might be required to reset channel settings repeatedly in order to view both UHF and cable channels, House Report, at 54; and installation and use of the switch with other common video equipment (such as videocassette recorders) could be "cumbersome or impossible," Senate Report, at 45, and nn. 115–116; House Report, at 54, and nn. 60–61; see also JSCR ¶¶ 746, 750, 758–767 (App. 1622, 1623, 1629–1634). Even the cable industry trade association (one of appellants here) determined that "the A/B switch is not a workable solution to the carriage problem." Senate Report, at 45; House Report, at 54. The group's engineering committee likewise concluded the switches suffered from technical problems and that no solution "appear[ed] imminent." Joint Petition for Reconsideration in MM Docket No. 85–349, pp. 6–8 (Dec. 17, 1986) (App. 1606–1607); see also Senate Report, at 45, and n. 115; House Report, at 54, and n. 60; Must Carry, Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science, and Transportation, 100th Cong., 1st Sess., 80 (1989) (statement of Preston Padden) (App. 1608); Hearings on Cable Television Regulation, at 901, n. 84 (statement of James B. Hedlund) (App. 1608).

Congress also had before it "considerable evidence," including two empirical studies, that "it is rare for [cable subscribers] ever to switch to receive an over-the-air signal," Senate Report, at 45; House Report, at 54, and n. 62. A 1991 study demonstrated that even "after several years of a government mandated program of providing A–B switches [to] consumers and a simultaneous education program on their use," NAB, A–B Switch Availability and Use (Sept. 23, 1991) (App. 132), and after FCC-mandated technical improvements to the switch, App. 129, only 11.7 percent of all cable-connected television sets were attached to an antenna

and had an A/B switch, *id.*, at 131. Of the small number of households possessing the switch, an even smaller number (only 38 percent) had ever used it. *Ibid.* See House Report, at 54, and nn. 62–63. Congress' decision that use of A/B switches was not a real alternative to must-carry was a reasonable one based on substantial evidence of technical shortcomings and lack of consumer acceptance. The reasonableness of its judgment was confirmed by additional evidence on remand that A/B switches can create signal interference and add complexity to video systems, factors discouraging their use. See Declaration of Eldon Haakinson ¶¶ 45–54 (App. 602–609); Supplemental Declaration of Eldon Haakinson ¶¶ 8–10 (App. 2025–2026); Memorandum from W. Cicora to L. Yaeger et al., dated June 25, 1993, p. 5 (channels may have to be reset every time A/B switch is used) (App. 246).

Appellants also suggest a leased-access regime, under which both broadcasters and cable programmers would have equal access to cable channels at regulated rates. Turner Brief 46–47. Appellants do not specify what kind of regime they would propose, or how it would operate, making this alternative difficult to compare to the must-carry rules. Whatever virtues the proposal might otherwise have, it would reduce the number of cable channels under cable systems' control in the same manner as must-carry. Because this alternative is aimed solely at addressing the bottleneck control of cable operators, it would not be as effective in achieving Congress' further goal of ensuring that significant programming remains available for the 40 percent of American households without cable. Indeed, unless the number of channels set aside for local broadcast stations were to decrease (sacrificing Congress' interest in preserving a multiplicity of broadcasters), additional channels would have to be set aside for cable programmers, further reducing the channels under the systems' control. Furthermore, Congress was specific in noting that requiring payment for cable car-

riage was inimical to the interests it was pursuing, because of the burden it would impose on small broadcasters. See House Report, at 51; Senate Report, at 43, 45. Congress specifically prohibited such payments under the Cable Act. 47 U. S. C. §§ 534(b)(10), 535(i).

Appellants next suggest a system of subsidies for financially weak stations. Appellants have not proposed any particular subsidy scheme, so it is difficult to determine whether this option presents a feasible means of achieving the Government's interests, let alone one preferable to must-carry under the First Amendment. To begin with, a system of subsidies would serve a very different purpose than must-carry. Must-carry is intended not to guarantee the financial health of all broadcasters, but to ensure a base number of broadcasters survive to provide service to noncable households. Must-carry is simpler to administer and less likely to involve the Government in making content-based determinations about programming. The must-carry rules distinguish between categories of speakers based solely on the technology used to communicate. The rules acknowledge cable systems' expertise by according them discretion to determine which broadcasters to carry on reserved channels, and (within the Cable Act's strictures) allow them to choose broadcasters with a view to offering program choices appealing to local subscribers. Appellants' proposal would require the Government to develop other criteria for giving subsidies and to establish a potentially elaborate administrative structure to make subsidy determinations.

Appellants also suggest a system of antitrust enforcement or an administrative complaint procedure to protect broadcasters from cable operators' anticompetitive conduct. See Turner Brief 47–48. Congress could conclude, however, that the considerable expense and delay inherent in antitrust litigation, and the great disparities in wealth and sophistication between the average independent broadcast station and average cable system operator, would make these remedies in-

adequate substitutes for guaranteed carriage. The record suggests independent broadcasters simply are not in a position to engage in complex antitrust litigation, which involves extensive discovery, significant motions practice, appeals, and the payment of high legal fees throughout. See JSCR ¶¶ 556–576 (App. 1528–1537); Meek Declaration ¶ 58 (Record, Defendants' Joint Submission of Expert Affidavits and Reports in Support of Motion for Summary Judgment, Vol. II.A, Exh. 2). An administrative complaint procedure, although less burdensome, would still require stations to incur considerable expense and delay before enforcing their rights. As it is, some public stations have been forced by limited resources to forgo pursuing administrative complaints under the Cable Act to obtain carriage. See Declaration of Carolyn Lewis ¶ 13 (App. 548–549); Declaration of John Beabout ¶ 11 (App. 526–527). Those problems would be compounded if instead of proving entitlement under must-carry, the station had to prove facts establishing an antitrust violation.

There is a final argument made by appellants that we do not reach. Appellant Time Warner Entertainment raises in its brief a separate First Amendment challenge to a subsection of the Cable Act, 47 U. S. C. § 534(c), that requires carriage on unfilled must-carry channels of low power broadcast stations if the FCC determines that the station's programming "would address local news and informational needs which are not being adequately served by full power television broadcast stations because of the geographic distance of such full power stations from the low power station's community of license." § 534(h)(2)(B). We earlier reserved this question and invited the District Court to address it on remand. See *Turner*, 512 U. S., at 643–644, n. 6. Because this question has received "only the most glancing" attention, *ibid.*, from the District Court and the parties, we have no more information about "the operation of, and justifications for, the low-power broadcast provisions," *ibid.*, on which to base an informed determination than we did on the

earlier appeal. The District Court's primary opinion disposed of the question in a perfunctory discussion, 910 F. Supp., at 750–751; and the dissent explicitly declined to reach the question, *id.*, at 789. The issue has received even less attention from the parties. It was not addressed in the jurisdictional statement, the motions to affirm, or the appellants' oppositions to the motions to affirm. In over 400 pages of merits briefs, the parties devoted a total of four paragraphs (two of which were relegated to footnotes) to conclusory argumentation on this subject, largely concerning not the merits of the question but whether it was even properly before us. On this state of the record we have insufficient basis to make an informed judgment on this discrete issue. Even if the issue is "fairly included" in the broadly worded question presented, it is tangential to the main issue, and prudence dictates that we not decide this question based on such scant argumentation. See *Socialist Labor Party* v. *Gilligan,* 406 U. S. 583, 588–589, n. 2 (1972); *Teamsters* v. *Denver Milk Producers, Inc.,* 334 U. S. 809 (1948) *(per curiam);* see also *Carducci* v. *Regan,* 714 F. 2d 171, 177 (CADC 1983) (Scalia, J.).

## III

Judgments about how competing economic interests are to be reconciled in the complex and fast-changing field of television are for Congress to make. Those judgments "cannot be ignored or undervalued simply because [appellants] cas[t] [their] claims under the umbrella of the First Amendment." *Columbia Broadcasting* v. *Democratic National Committee,* 412 U. S., at 103. Appellants' challenges to must-carry reflect little more than disagreement over the level of protection broadcast stations are to be afforded and how protection is to be attained. We cannot displace Congress' judgment respecting content-neutral regulations with our own, so long as its policy is grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination. Those requirements were met in this case, and in

these circumstances the First Amendment requires nothing more. The judgment of the District Court is affirmed.

*It is so ordered.*

JUSTICE STEVENS, concurring.

As JUSTICE KENNEDY clearly explains, the policy judgments made by Congress in the enactment of legislation that is intended to forestall the abuse of monopoly power are entitled to substantial deference. *Ante,* at 195–196, 224 and this page. That is true even when the attempt to protect an economic market imposes burdens on communication. Cf. *United States* v. *Radio Corp. of America,* 358 U. S. 334 (1959); *FTC* v. *Superior Court Trial Lawyers Assn.,* 493 U. S. 411, 428, n. 12 (1990) ("'This Court has recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association'" (quoting *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886, 912 (1982))). If this statute regulated the content of speech rather than the structure of the market, our task would be quite different. See *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 669, n. 2 (1994) (STEVENS, J., concurring in part and concurring in judgment). Cf. *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115, 129 (1989); *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 843 (1978). Though I write to emphasize this important point, I fully concur in the Court's thorough opinion.

JUSTICE BREYER, concurring in part.

I join the opinion of the Court except insofar as Part II–A–1 relies on an anticompetitive rationale. I agree with the majority that the statute must be "sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Ante,* at 189 (citing *United States* v.

*O'Brien*, 391 U. S. 367, 377 (1968)). I also agree that the statute satisfies this standard. My conclusion rests, however, not upon the principal opinion's analysis of the statute's efforts to "promot[e] fair competition," see *post*, at 230–232, 237–240, but rather upon its discussion of the statute's other objectives, namely, " '(1) preserving the benefits of free, over-the-air local broadcast television,' " and " '(2) promoting the widespread dissemination of information from a multiplicity of sources,' " *ante*, at 189 (quoting *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 662 (1994) *(Turner)*). Whether or not the statute does or does not sensibly compensate for some significant market defect, it undoubtedly seeks to provide over-the-air viewers who *lack* cable with a rich mix of over-the-air programming by guaranteeing the over-the-air stations that provide such programming with the extra dollars that an additional cable audience will generate. I believe that this purpose—to assure the over-the-air public "access to a multiplicity of information sources," *id.*, at 663—provides sufficient basis for rejecting appellants' First Amendment claim.

I do not deny that the compulsory carriage that creates the "guarantee" extracts a serious First Amendment price. It interferes with the protected interests of the cable operators to choose their own programming; it prevents displaced cable program providers from obtaining an audience; and it will sometimes prevent some cable viewers from watching what, in its absence, would have been their preferred set of programs. *Ante*, at 214; *post*, at 250. This "price" amounts to a "suppression of speech."

But there are important First Amendment interests on the other side as well. The statute's basic noneconomic purpose is to prevent too precipitous a decline in the quality and quantity of programming choice for an ever-shrinking non-cable-subscribing segment of the public. *Ante*, at 190, 191–194. This purpose reflects what "has long been a basic tenet of national communications policy," namely, that "the

widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Turner, supra,* at 663 (quoting *United States* v. *Midwest Video Corp.,* 406 U. S. 649, 668, n. 27 (1972) (plurality opinion) (quoting *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945) (internal quotation marks omitted)); see also *FCC* v. *WNCN Listeners Guild,* 450 U. S. 582, 594 (1981). That policy, in turn, seeks to facilitate the public discussion and informed deliberation, which, as Justice Brandeis pointed out many years ago, democratic government presupposes and the First Amendment seeks to achieve. *Whitney* v. *California,* 274 U. S. 357, 375–376 (1927) (concurring opinion). See also *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969); *Associated Press* v. *United States, supra,* at 20. Indeed, *Turner* rested in part upon the proposition that "assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." 512 U. S., at 663.

With important First Amendment interests on both sides of the equation, the key question becomes one of proper fit. That question, in my view, requires a reviewing court to determine both whether there are significantly less restrictive ways to achieve Congress' over-the-air programming objectives, and also to decide whether the statute, in its effort to achieve those objectives, strikes a reasonable balance between potentially speech-restricting and speech-enhancing consequences. *Ward* v. *Rock Against Racism,* 491 U. S. 781, 799–800 (1989); *ante,* at 217–218. The majority's opinion analyzes and evaluates those consequences, and I agree with its conclusions in respect to both of these matters. *Ante,* at 213–224.

In particular, I note (and agree) that a cable system, physically dependent upon the availability of space along city streets, at present (perhaps less in the future) typically faces little competition, that it therefore constitutes a kind of bot-

tleneck that controls the range of viewer choice (whether or not it uses any consequent economic power for economically predatory purposes), and that *some* degree—at least a limited degree—of governmental intervention and control through regulation can prove appropriate when justified under *O'Brien* (at least when not "content based"). *Ante*, at 197, 208–213; see also Defendants' Joint Statement of Evidence before Congress ¶¶ 12–21, 31–59 (App. 1254–1258, 1262–1274) (JSCR); Cable Television Consumer Protection and Competition Act of 1992, § 2(a)(2), P. L. 102–385, 106 Stat. 1460. Cf. *Red Lion, supra*, at 377–378, 387–401; 47 CFR §§ 73.123, 73.300, 73.598, 73.679 (1969) (Federal Communications Commission regulations upheld in *Red Lion*); *United Broadcasting Co.*, 10 F. C. C. 515 (1945); *New Broadcasting Co.*, 6 P & F Radio Reg. 258 (1950). I also agree that, without the statute, cable systems would likely carry significantly fewer over-the-air stations, *ante*, at 191, 202–205, that station revenues would therefore decline, *ante*, at 208–213, and that the quality of over-the-air programming on such stations would almost inevitably suffer, *e. g.*, JSCR ¶¶ 596, 704–706 (App. 1544, 1600–1601); Rebuttal Declaration of Roger G. Noll ¶¶ 5, 11, 34, 38 (App. 1790, 1793, 1804–1805, 1806). I agree further that the burden the statute imposes upon the cable system, potential cable programmers, and cable viewers is limited and will diminish as typical cable system capacity grows over time.

Finally, I believe that Congress could reasonably conclude that the statute will help the typical over-the-air viewer (by maintaining an expanded range of choice) more than it will hurt the typical cable subscriber (by restricting cable slots otherwise available for preferred programming). The latter's cable choices are many and varied, and the range of choice is rapidly increasing. The former's over-the-air choice is more restricted; and, as cable becomes more popular, it may well become still more restricted insofar as the over-the-air market shrinks and thereby, by itself, becomes

less profitable. In these circumstances, I do not believe the First Amendment dictates a result that favors the cable viewers' interests.

These and other similar factors discussed by the majority lead me to agree that the statute survives "intermediate scrutiny," whether or not the statute is properly tailored to Congress' purely economic objectives.

JUSTICE O'CONNOR, with whom JUSTICE SCALIA, JUSTICE THOMAS, and JUSTICE GINSBURG join, dissenting.

In sustaining the must-carry provisions of the Cable Television Protection and Competition Act of 1992 (Cable Act), Pub. L. 102–385, §§ 4–5, 106 Stat. 1460, against a First Amendment challenge by cable system operators and cable programmers, the Court errs in two crucial respects. First, the Court disregards one of the principal defenses of the statute urged by appellees on remand: that it serves a substantial interest in preserving "diverse," "quality" programming that is "responsive" to the needs of the local community. The course of this litigation on remand and the proffered defense strongly reinforce my view that the Court adopted the wrong analytic framework in the prior phase of this case. See *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 643–651 (1994) *(Turner); id.*, at 675–680 (O'CONNOR, J., concurring in part and dissenting in part). Second, the Court misapplies the "intermediate scrutiny" framework it adopts. Although we owe deference to Congress' predictive judgments and its evaluation of complex economic questions, we have an independent duty to identify with care the Government interests supporting the scheme, to inquire into the reasonableness of congressional findings regarding its necessity, and to examine the fit between its goals and its consequences. *Edenfield* v. *Fane*, 507 U. S. 761, 770–771 (1993); *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 129 (1989); *Los Angeles* v. *Preferred Communications, Inc.*, 476 U. S. 488, 496 (1986); *Landmark*

*Communications, Inc.* v. *Virginia,* 435 U. S. 829, 843 (1978). The Court fails to discharge its duty here.

I

I did not join those portions of the principal opinion in *Turner* holding that the must-carry provisions of the Cable Act are content neutral and therefore subject to intermediate First Amendment scrutiny. 512 U. S., at 643–651. The Court there referred to the "unusually detailed statutory findings" accompanying the Cable Act, in which Congress recognized the importance of preserving sources of local news, public affairs, and educational programming. *Id.,* at 646; see *id.,* at 632–634, 648. Nevertheless, the Court minimized the significance of these findings, suggesting that they merely reflected Congress' view of the "intrinsic value" of broadcast programming generally, rather than a congressional preference for programming with local, educational, or informational content. *Id.,* at 648.

In *Turner,* the Court drew upon Senate and House Reports to identify three "interests" that the must-carry provisions were designed to serve: "(1) preserving the benefits of free, over-the-air local broadcast television, (2) promoting the widespread dissemination of information from a multiplicity of sources, and (3) promoting fair competition in the market for television programming." *Id.,* at 662 (citing S. Rep. No. 102–92, p. 58 (1991); H. R. Rep. No. 102–628, p. 63 (1992)). The Court reiterates these interests here, *ante,* at 189–190, but neither the principal opinion nor the partial concurrence ever explains the relationship between them with any clarity.

Much of the principal opinion treats the must-carry provisions as a species of antitrust regulation enacted by Congress in response to a perceived threat that cable system operators would otherwise engage in various forms of anticompetitive conduct resulting in harm to broadcasters. *E. g., ante,* at 191, 196–208. The Court recognizes that ap-

pellees cannot show an anticompetitive threat to broadcast television simply by demonstrating that "a few" broadcast stations would be forced off the air in the absence of must-carry. *Ante*, at 191; see Brief for Federal Appellees 14, 17, 18. No party has ever questioned that adverse carriage decisions by cable operators will threaten some broadcasters in some markets. The notion that Congress premised the must-carry provisions upon a far graver threat to the structure of the local broadcast system than the loss of "a few" stations runs through virtually every passage in the principal *Turner* opinion that discusses the Government interests the provisions were designed to serve. See, *e. g.*, 512 U. S., at 647 (recognizing substantiality of interest in " 'protecting noncable households from loss of *regular television broadcasting service* due to competition from cable systems' " (quoting *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 714 (1984) (emphasis added))); 512 U. S., at 652 ("Congress sought to preserve the existing structure of the Nation's broadcast television medium, . . . and, in particular, to ensure that broadcast television *remains available* as a source of video programming for those without cable" (emphasis added)); *id.*, at 663 (recognizing interest in "maintaining the local broadcasting structure"); *id.*, at 664–665 (plurality opinion) (characterizing inquiry as whether Government "has adequately shown that the economic health of local broadcasting is in *genuine jeopardy*" (emphasis added)); *id.*, at 665 (noting Government's reliance on Congress' finding that "absent mandatory carriage rules, the continued *viability* of local broadcast television would be 'seriously jeopardized' " (quoting Cable Act, § 2(a)(16) (emphasis added))); *id.*, at 666 (recognizing Government's assertion that "the must-carry rules are necessary to protect the *viability* of broadcast television" (emphasis added)). Ostensibly adopting this framework, the Court now asks whether Congress could reasonably have thought the must-carry regime necessary to prevent a "*significant* reduction in the multiplicity of broad-

cast programming sources available to noncable households."
*Ante,* at 193 (emphasis added).

I fully agree that promoting fair competition is a legitimate and substantial Government goal. But the Court nowhere examines whether the breadth of the must-carry provisions comports with a goal of preventing anticompetitive harms. Instead, in the course of its inquiry into whether the must-carry provisions are "narrowly tailored," the principal opinion simply assumes that most adverse carriage decisions are anticompetitively motivated, and that must-carry is therefore a measured response to a problem of anticompetitive behavior. *Ante,* at 216–217. We ordinarily do not substitute unstated and untested assumptions for our independent evaluation of the facts bearing upon an issue of constitutional law. See *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 636 (1980).

Perhaps because of the difficulty of defending the must-carry provisions as a measured response to anticompetitive behavior, the Court asserts an "independent" interest in preserving a "multiplicity" of broadcast programming sources. *Ante,* at 194; *ante,* at 226–227 (BREYER, J., concurring in part). In doing so, the Court posits existence of "conduct that threatens" the availability of broadcast television outlets, quite apart from anticompetitive conduct. *Ante,* at 194. We are left to wonder what precisely that conduct might be. Moreover, when separated from anticompetitive conduct, this interest in preserving a "multiplicity of broadcast programming sources" becomes poorly defined. Neither the principal opinion nor the partial concurrence offers any guidance on what might constitute a "significant reduction" in the availability of broadcast programming. The proper analysis, in my view, necessarily turns on the present *distribution* of broadcast stations among the local broadcast markets that make up the national broadcast "system." Whether cable poses a "significant" threat to a local broadcast market depends first on how many broadcast stations in

that market will, in the absence of must-carry, remain available to viewers in noncable households. It also depends on whether viewers actually watch the stations that are dropped or denied carriage. The Court provides some raw data on adverse carriage decisions, but it never connects those data to markets and viewership. Instead, the Court proceeds from the assumptions that adverse carriage decisions nationwide will affect broadcast markets in proportion to their size; and that all broadcast programming is watched by viewers. Neither assumption is logical or has any factual basis in the record.

Appellees bear the burden of demonstrating that the provisions of the Cable Act restricting expressive activity survive constitutional scrutiny. See *Turner, supra,* at 664. As discussed below, the must-carry provisions cannot be justified as a narrowly tailored means of addressing anticompetitive behavior. See *infra,* at 235–257; *ante,* at 225, 226, 227–228 (BREYER, J., concurring in part). As a result, the Court's inquiry into whether must-carry would prevent a "significant reduction in the multiplicity of broadcast programming sources" collapses into an analysis of an ill-defined and generalized interest in maintaining broadcast stations, wherever they might be threatened and whatever their viewership. Neither the principal opinion nor the partial concurrence ever explains what kind of conduct, apart from anticompetitive conduct, threatens the "multiplicity" of broadcast programming sources. Indeed, the only justification advanced by the parties for furthering this interest is heavily content based. It is undisputed that the broadcast stations protected by must-carry are the "marginal" stations within a given market, see *infra,* at 244; the record on remand reveals that any broader threat to the broadcast system was entirely mythical. Pressed to explain the importance of preserving noncable viewers' access to "vulnerable" broadcast stations, appellees emphasize that the must-carry rules are necessary to ensure that broadcast stations main-

tain "diverse," "quality" programming that is "responsive" to the needs of the local community. Brief for Federal Appellees 13, 30; see Brief for Appellees National Association of Broadcasters et al. 36–37 (NAB Brief); Tr. of Oral Arg. 29, 42; see also *ante*, at 226 (BREYER, J., concurring in part) (justifying must-carry as a means of preventing a decline in "quality and quantity of programming choice"). Must-carry is thus justified as a way of preserving viewers' access to a Spanish or Chinese language station or of preventing an independent station from adopting a home-shopping format. NAB Brief 28, 33; Brief for Federal Appellees 31; Tr. of Oral Arg. 32–33. Undoubtedly, such goals are reasonable and important, and the stations in question may well be worthwhile targets of Government subsidies. But appellees' characterization of must-carry as a means of protecting these stations, like the Court's explicit concern for promoting " 'community self-expression' " and the " 'local origination of broadcast programming,' " *ante*, at 192, 193 (brackets omitted), reveals a content-based preference for broadcast programming. This justification of the regulatory scheme is, in my view, wholly at odds with the *Turner* Court's premise that must-carry is a means of preserving "access to free television programming—*whatever its content*," 512 U. S., at 649 (emphasis added).

I do not read JUSTICE BREYER's opinion—which analyzes the must-carry rules in part as a "speech-enhancing" measure designed to ensure a "rich mix" of over-the-air programming, see *ante*, at 226, 227—to treat the content of over-the-air programming as irrelevant to whether the Government's interest in promoting it is an important one. The net result appears to be that five Justices of this Court *do not* view must-carry as a narrowly tailored means of serving a substantial governmental interest in preventing anticompetitive behavior; and that five Justices of this Court *do* see the significance of the content of over-the-air programming to the Government's and appellees' efforts to defend the law.

Under these circumstances, the must-carry provisions should be subject to strict scrutiny, which they surely fail.

## II

The principal opinion goes to great lengths to avoid acknowledging that preferences for "quality," "diverse," and "responsive" local programming underlie the must-carry scheme, although the partial concurrence's reliance on such preferences is explicit. See *ante,* at 226 (opinion of BREYER, J.). I take the principal opinion at its word and evaluate the claim that the threat of anticompetitive behavior by cable operators supplies a content-neutral basis for sustaining the statute. It does not.

The *Turner* Court remanded the case for a determination whether the must-carry provisions satisfy intermediate scrutiny under *United States* v. *O'Brien,* 391 U. S. 367 (1968). Under that standard, appellees must demonstrate that the must-carry provisions (1) "furthe[r] an important or substantial government interest"; and (2) burden speech no more "than is essential to the furtherance of that interest." *Id.,* at 377; see also *Ward* v. *Rock Against Racism,* 491 U. S. 781, 799 (1989). The *Turner* plurality found that genuine issues of material fact remained as to both parts of the *O'Brien* analysis. On whether must-carry furthers a substantial governmental interest, the *Turner* Court remanded the case to test two essential and unproven propositions: "(1) that unless cable operators are compelled to carry broadcast stations, *significant numbers* of broadcast stations will be refused carriage on cable systems; and (2) that the broadcast stations denied carriage will either *deteriorate to a substantial degree or fail altogether."* 512 U. S., at 666 (emphasis added). As for whether must-carry restricts no more speech than essential to further Congress' asserted purpose, the *Turner* plurality found evidence lacking on the extent of the burden that the must-carry provisions would place on cable operators and cable programmers. *Id.,* at 667–668.

236 

The District Court resolved this case on cross-motions for summary judgment. As the Court recognizes, *ante*, at 211, the fact that the evidence before Congress might have been in conflict will not necessarily preclude summary judgment upholding the must-carry scheme. The question, rather, is what the undisputed facts show about the reasonableness of Congress' conclusions. We are not, however, at liberty to substitute speculation for evidence or to ignore factual disputes that call the reasonableness of Congress' findings into question. The evidence on remand demonstrates that appellants, not appellees, are entitled to summary judgment.

A

The principal opinion devotes substantial discussion to the structure of the cable industry, see *ante*, at 197, 206–207, a matter that was uncontroversial in *Turner*. See, *e. g.*, 512 U. S., at 627–628, 632–633, 639–640; *id.*, at 684 (O'CONNOR, J., concurring in part and dissenting in part). As of 1992, cable already served 60 percent of American households. I agree with the observation that Congress could reasonably predict an increase in cable penetration of the local video programming market. *Ante*, at 197. Local franchising requirements and the expense of constructing a cable system to serve a particular area make it possible for cable franchisees to exercise a monopoly over cable service. 512 U. S., at 633. Nor was it ever disputed that some cable system operators own large numbers of systems nationwide, or that some cable systems are affiliated with cable programmers. *Turner Broadcasting* v. *FCC*, 819 F. Supp. 32, 39–40 (DC 1993) (opinion of Jackson, J.); *id.*, at 57 (Williams, J., dissenting); Plaintiffs' Response to NAB's Statement of Material Facts ¶ 4 (Feb. 12, 1993) (App. in *Turner*, O. T. 1993, No. 93–44, p. 186); Plaintiff Time Warner's Statement of Material Facts as to Which There Is No Genuine Issue ¶¶ 5, 12 (App. in *Turner*, O. T. 1993, *supra*, at 198, 199).

What was not resolved in *Turner* was whether "reasonable inferences based on substantial evidence," 512 U. S., at 666 (plurality opinion), supported Congress' judgment that the must-carry provisions were necessary "to prevent cable operators from exploiting their economic power to the detriment of broadcasters," *id.*, at 649. Because I remain convinced that the statute is not a measured response to congressional concerns about monopoly power, see *infra*, at 249–256, in my view the principal opinion's discussion on this point is irrelevant. But even if it were relevant, it is incorrect.

1

The *Turner* plurality recognized that Congress' interest in curtailing anticompetitive behavior is substantial "in the abstract." 512 U. S., at 664. The principal opinion now concludes that substantial evidence supports the congressional judgment that cable operators have incentives to engage in significant anticompetitive behavior. It appears to accept two related arguments on this point: first, that vertically integrated cable operators prefer programming produced by their affiliated cable programming networks to broadcast programming, *ante*, at 198–199, 200; and second, that potential advertising revenues supply cable system operators, whether affiliated with programmers or not, with incentives to prefer cable programming to broadcast programming, *ante*, at 200–202.

To support the first proposition, the principal opinion states that "[e]xtensive testimony" before Congress showed that in fact operators do have incentives to favor vertically integrated programmers. *Ante*, at 198. This testimony, noteworthy as it may be, is primarily that of persons appearing before Congress on behalf of the private appellees in this case. Compare *ante*, at 198–199, with Competitive Issues in the Cable Television Industry: Hearing before the Subcommittee on Antitrust, Monopolies and Business Rights of the Senate Committee on the Judiciary, 100th Cong., 2d Sess.,

543 (1988) (Hearing on Competitive Issues) (statement of Milton Maltz, representative of Association of Independent Television Stations, Inc. (INTV), now appellee Association of Local Television Stations, Inc.) (Record, Defendants' Joint Submission of Congressional Record (CR) Vol. I.C, Exh. 8, p. CR 01882); Cable Television Regulation: Hearings on H. R. 1303 and H. R. 2546 before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce, 102d Cong., 1st Sess., 858 (1992) (statement of James B. Hedlund, president of INTV) (CR Vol. I.J, Exh. 18, at CR 07862); *id.*, at 752 (statement of Edward O. Fritts, president of appellee NAB) (CR Vol. I.J, Exh. 18, at CR 07756); *id.*, at 701 (statement of Gene Kimmelman, legislative director of appellee Consumer Federation of America) (CR Vol. I.J, Exh. 18, at CR 07706). It is appropriate to regard the testimony of interested persons with a degree of skepticism when our task is to engage in " 'independent judgment of the facts bearing on an issue of constitutional law.'" *Turner, supra*, at 666 (plurality opinion) (quoting *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S., at 129). Moreover, even accepting as reasonable Congress' conclusion that cable operators have incentives to favor affiliated programmers, Congress has already limited the number of channels on a cable system that can be occupied by affiliated programmers. 47 U. S. C. § 533(f)(1)(B); 47 CFR § 76.504 (1995). Once a cable system operator reaches that cap, it can no longer bump a broadcaster in favor of an affiliated programmer. If Congress were concerned that broadcasters favored too many affiliated programmers, it could simply adjust the cap. Must-carry simply cannot be justified as a response to the allegedly "substantial" problem of vertical integration.

The second argument, that the quest for advertising revenue will supply cable operators with incentives to drop local broadcasters, takes two forms. First, some cable programmers offer blank slots within a program into which a cable operator can insert advertisements; appellees argue that

"[t]he opportunity to sell such advertising gives cable programmers an additional value to operators above broadcast stations . . . ." Brief for Federal Appellees 24. But that "additional value" arises only because the must-carry provisions *require* cable operators to carry broadcast signals without alteration. 47 U. S. C. § 534(b)(3). Judge Williams was correct in noting that the Government cannot have "a 'substantial interest' in remedying a competitive distortion that arises entirely out of a detail in its own purportedly remedial legislation." 910 F. Supp. 734, 777 (DC 1995) (dissenting opinion). Second, appellees claim that since cable operators compete directly with broadcasters for some advertising revenue, operators will profit if they can drive broadcasters out of the market and capture their advertising revenue. Even if the record before Congress included substantial evidence that "advertising revenue would be of increasing importance to cable operators as subscribership growth began to flatten," *ante*, at 203, it does not necessarily follow that Congress could reasonably find that the quest for advertising revenues supplies cable operators with incentives to engage in predatory behavior, or that must-carry is a reasonable response to such incentives. There is no dispute that a cable system depends primarily upon its subscriber base for revenue. A cable operator is therefore unlikely to drop a widely viewed station in order to capture advertising revenues— which, according to the figures of appellees' expert, account for between one and five percent of the total revenues of most large cable systems. Declaration of James N. Dertouzos ¶ 22 (App. 967). In doing so, it would risk losing subscribers. Nevertheless, appellees contend that cable operators will drop some broadcast stations in spite of, and not because of, viewer preferences. The principal opinion suggests that viewers are likely to subscribe to cable even though they prefer certain over-the-air programming to cable programming, because they would be willing to trade access to their preferred channel for access to dozens of cable

channels. *Ante,* at 202. Even assuming that, at the margin, advertising revenues would drive cable systems to drop some stations—invariably described as "vulnerable" or "smaller" independents, see NAB Brief 22; Brief for Federal Appellees 25, and n. 14—the strategy's success would depend upon the additional untested premise that the advertising revenues freed by dropping a broadcast station will flow to cable operators rather than to *other* broadcasters.

### 2

Under the standard articulated by the *Turner* plurality, the conclusion that must-carry serves a substantial governmental interest depends upon the "essential propositio[n]" that, without must-carry, "significant numbers of broadcast stations will be refused carriage on cable systems." 512 U. S., at 666. In analyzing whether this undefined standard is satisfied, the Court focuses almost exclusively on raw numbers of stations denied carriage or "repositioned"—that is, shifted out of their traditional channel positions.

The Court begins its discussion of evidence of adverse carriage decisions with the 1988 study sponsored by the Federal Communications Commission (FCC). *Ante,* at 202–203; see Cable System Broadcast Signal Carriage Survey, Staff Report by the Policy and Rules Division, Mass Media Bureau (Sept. 1, 1988) (App. 37). But in *Turner,* the plurality criticized this very study, noting that it did not indicate the timeframe within which carriage denials occurred or whether the stations were later restored to their positions. 512 U. S., at 667. As for the evidence in the record before Congress, these gaps persist; the Court relies on a study of *public* television stations to support the proposition that "in the vast majority of cases, dropped stations were not restored to the cable service." *Ante,* at 203.

In canvassing the additional evidence offered on remand, the Court focuses on the suggestion of one of appellees' experts that the 1988 FCC survey underestimated the number

of drops of broadcast stations in the non-must-carry era. The data do not indicate which of these stations would now qualify for mandatory carriage. Appellees' expert frames the relevant drop statistic as "subscriber instances"—that is, the number of drop instances multiplied by the number of cable subscribers affected. Declaration of Tom Meek ¶ 17 (Meek Declaration) (App. 623). Two-thirds of the "subscriber instances" of drops existing as of mid-1992 remained uncured as of mid-1994, fully 19 months after the present must-carry rules went into effect. Meek Declaration, Attachment C (Record, Defendants' Joint Submission of Expert Affidavits and Reports in Support of Motion for Summary Judgment, Vol. II.A, Exh. 2). The Court discounts the importance of whether dropped stations now qualify for mandatory carriage, on the ground that requiring any such showing places an "improper burden" on the Legislative Branch. *Ante*, at 213. It seems obvious, however, that if the must-carry rules will not reverse those adverse carriage decisions on which appellees rely to illustrate the Government "interest" supporting the rules, then a significant question remains as to whether the rules in fact serve the articulated interest. Without some further analysis, I do not see how the Court can, in the course of its independent scrutiny on a question of constitutional law, deem Congress' judgment "reasonable."

In any event, the larger problem with the Court's approach is that neither the FCC study nor the additional evidence on remand canvassed by the Court, *ante*, at 204–207, says anything about the broadcast markets in which adverse carriage decisions take place. The Court accepts Congress' stated concern about preserving the availability of a "multiplicity" of broadcast stations, but apparently thinks it sufficient to evaluate that concern in the abstract, without considering how much local service is already available in a given broadcast market. *Ante*, at 212–213; see also *ante*, at 226–227 (BREYER, J., concurring in part). I address this gap in the Court's discussion at greater length below, *infra*, at 247–250,

by examining the reasonableness of Congress' prediction that adverse carriage decisions will inflict severe harm on broadcast stations.

Nor can we evaluate whether must-carry is necessary to serve an interest in preserving broadcast stations without examining the value of the stations protected by the must-carry scheme to viewers in noncable households. By disregarding the distribution and viewership of stations not carried on cable, the Court upholds the must-carry provisions without addressing the interests of the over-the-air television viewers that Congress purportedly seeks to protect. See *Turner*, 512 U. S., at 647 (describing interest in "protecting *noncable* households from loss of regular television broadcasting service" (emphasis added; internal quotation marks omitted)); *id.*, at 652 (describing interest in ensuring that broadcast television remains available as a source of video programming *for those without cable*); *ante*, at 193 (describing interest in preventing "any significant reduction in the multiplicity of broadcast programming sources available to *noncable* households" (emphasis added)). The Court relies on analyses suggesting that, as of 1992, the typical independent commercial broadcaster was being denied carriage on cable systems serving 47 percent of subscribers in its local market, and the typical noncommercial station was denied carriage on cable systems serving 36 percent of subscribers in its local market. *Ante*, at 204. The *only* analysis in the record of the relationship between carriage and noncable viewership favors the appellants. A 1991 study by Federal Trade Commission staff concluded that most cable systems voluntarily carried broadcast stations with any reportable ratings in noncable households and that most instances of noncarriage involved "relatively remote (and duplicated) network stations, or local stations that few viewers watch." Carriage of Television Broadcast Signals by Cable Television Systems, Reply Comment of the Staff of the Bureau of Economics and the San Francisco Re-

gional Office of the Federal Trade Commission, p. 3 (Nov. 26, 1991) (App. 163); see also Declaration of Stanley M. Besen (Besen Declaration) (App. 808, 818); Second Declaration of Stanley M. Besen (App. 1812) (presenting data that (1) the typical cable subscriber was served by a cable system carrying local broadcast stations accounting for 97 percent of viewing in noncable households; and (2) the typical cable subscriber was served by a cable system carrying 90 percent of all local broadcast stations with any reportable ratings and 30 percent of all local broadcast stations with no reportable ratings).

Appellees claim there are various methodological flaws in each study, including appellants' expert's reliance on Nielsen data to measure viewership shares. A protective order entered by the District Court in this case prevents the parties from contesting the accuracy of such data. App. 321. But appellees—who bear the burden of proof in this case—offer no alternative measure of the viewership in noncable households of stations dropped or denied carriage. Instead, appellees and their experts repeatedly emphasize the importance of preserving "vulnerable" or "marginal" independent stations serving "relatively small" audiences. Brief for Federal Appellees 14, 17, 25, n. 14; NAB Brief 31; see also Deposition of James N. Dertouzos (App. 381) (describing broadcast stations affected by carriage denials as "[s]tations on the margin of cable operator decisionmaking now and in the future"); Deposition of Roger G. Noll (App. 446) (cable operators' advertising incentives will operate "at the margin" and affect "weaker stations, UHF independent stations"); id., at 450 (stations dropped will be "[t]hose that have the lowest audience ratings combined with the absence of a specific target audience"); Deposition of Harry Shooshan III (App. 477) (must-carry has benefited "stations that were not as strong, that were marginal"); Reply Declaration of Roger G. Noll ¶ 19 (App. 2009) ("While frequently . . . the stations not carried by cable systems have low ratings, the point is

this: even the lowest rated commercial stations attract view-
ers, and the lowest rated noncommercial stations attract
members"). The Court suggests that it is appropriate to
disregard the low noncable viewership of stations denied car-
riage, because in some instances *cable* viewers preferred the
dropped broadcast channels to the cable channels that re-
placed them. *Ante*, at 206. The viewership statistics in
question, as well as their significance, are sharply disputed,
but they are also irrelevant. The issue is whether the Gov-
ernment can demonstrate a substantial interest in forced car-
riage of certain *broadcast* stations, for the benefit of viewers
who lack access to cable. That inquiry is not advanced by
an analysis of relative *cable* household viewership of broad-
cast and cable programming. When appellees are pressed
to explain the Government's "substantial interest" in pre-
serving noncable viewers' access to "vulnerable" or "mar-
ginal" stations with "relatively small" audiences, it becomes
evident that the interest has nothing to do with anticompeti-
tive behavior, but has everything to do with content—pre-
serving "quality" local programming that is "responsive" to
community needs. Brief for Federal Appellees 13, 30. In-
deed, JUSTICE BREYER expressly declines to accept the anti-
competitive rationale for the must-carry rules embraced by
the principal opinion, and instead explicitly relies on a need
to preserve a "rich mix" of "quality" programming. *Ante*,
at 226 (opinion concurring in part).

### 3

I turn now to the evidence of harm to broadcasters denied
carriage or repositioned. The Court remanded for a deter-
mination whether broadcast stations denied carriage would
be at " 'serious risk of financial difficulty' " and would " 'dete-
riorate to a substantial degree or fail altogether.' " *Ante*, at
208 (quoting *Turner*, 512 U. S., at 667, 666). The *Turner*
plurality noted that there was no evidence that "local broad-
cast stations have fallen into bankruptcy, turned in their

broadcast licenses, curtailed their broadcast operations, or suffered a serious reduction in operating revenues" because of adverse carriage decisions. *Id.*, at 667. The record on remand does not permit the conclusion, at the summary judgment stage, that Congress could reasonably have predicted serious harm to a significant number of stations in the absence of must-carry.

The purported link between an adverse carriage decision and severe harm to a station depends on yet another untested premise. Even accepting the conclusion that a cable system operator has a monopoly over *cable* services to the home, *supra*, at 237, it does not necessarily follow that the operator also has a monopoly over all *video* services to cabled households. Cable subscribers using an input selector switch and an antenna can receive broadcast signals. Widespread use of such switches would completely eliminate any cable system "monopoly" over sources of video input. See 910 F. Supp., at 786 (Williams, J., dissenting). Growing use of direct-broadcast satellite television also tends to undercut the notion that cable operators have an inevitable monopoly over video services entering cable households. See, *e. g.*, Farhi, Dishing Out the Competition to Cable TV, Washington Post, Oct. 12, 1996, at H1, col. 3.

In the Cable Act, Congress rejected the wisdom of any "substantial societal investment" in developing input selector switch technology. § 2(a)(18). In defending this choice, the Court purports to identify "substantial evidence of technological shortcomings" that prevent widespread, efficient use of such devices. But nearly all of the "data" in question are drawn from sources predating the enactment of must-carry by roughly six years. Compare *ante*, at 219–220, with Defendants' Joint Statement of Evidence Before Congress ¶ 725 (JSCR) (citing ELRA Group, Inc., Outdoor Antennas, Reception of Local Television Signals and Cable Television i–ii (Jan. 28, 1986), App. H to NAB Testimony in Cable Legislation before the Subcommittee on Telecommunications and

Finance of the House Committee on Energy and Commerce, 101st Cong., 2d Sess. (May 16, 1990)) (CR Vol. I.L, Exh. 22, at CR 08828); JSCR ¶¶ 759–760 (App. 1629–1630) (citing Comments of INTV in MM Docket No. 85–349, at 73 (Jan. 29, 1986)) (CR Vol. I.BB, Exh. 162, at CR 15901–15902); JSCR ¶ 758 (App. 1628) (citing Comments of NAB in MM Docket No. 85–349, at 23–24 (Jan. 29, 1986)) (CR Vol. I.BB, Exh. 165, at CR 16183–16184); JSCR ¶¶ 718, 724, 751–752, 754–755, 761–762 (App. 1605–1607, 1609–1610, 1624–1627, 1630–1631) (citing Joint Petition for Reconsideration in MM Docket No. 85–349 (Dec. 17, 1986)) (CR Vol. I.DD, Exh. 183, at CR 16726–16839); JSCR ¶¶ 738–739, 764, 767 (App. 1617–1618, 1632–1634) (citing Petition for Reconsideration by Adelphia Communications Corp. et al. in MM Docket No. 85–349, at 27–32 (Jan. 12, 1987)) (CR Vol. I.DD, Exh. 184, at CR 16892–16897). The Court notes the importance of deferring to congressional judgments about the "interaction of industries undergoing rapid economic and technological change." *Ante*, at 196. But this principle does not require wholesale deference to judgments about rapidly changing technologies that are based on unquestionably outdated information.

The Court concludes that the evidence on remand meets the threshold of harm established in *Turner*. The Court begins with the "[c]onsiderable evidence" that broadcast stations denied carriage have fallen into bankruptcy. *Ante*, at 209. The analysis, however, does not focus on features of the market in which these stations were located or on the size of the audience they commanded. The "considerable evidence" relied on by the Court consists of repeated references to the bankruptcies of the same 23 commercial independent stations—apparently, new stations. See JSCR ¶¶ 659, 671–672, 676, 681 (App. 1576, 1581–1582, 1584, 1587); Hearing on Competitive Issues, at 548 (statement of Milton Maltz) (CR Vol. I.C, Exh. 8, at CR 01887). Because the must-carry provisions have never been justified as a means of *enhancing* broadcast television, I do not understand the

relevance of this evidence, or of the evidence concerning the difficulties encountered by *new* stations seeking financing. See *ante*, at 209 (citing JSCR ¶¶ 643–658 (App. 1564–1576)).

The Court also claims that the record on remand reflects "considerable evidence" of stations curtailing their broadcast operations or suffering reductions in operating revenues. *Ante*, at 209. Most of the anecdotal accounts of harm on which the Court relies are sharply disputed. Compare JSCR ¶¶ 618, 619, 622, 623, 692 (App. 1553–1555, 1591), with Time Warner Entertainment Company, L. P.'s Broadcast Station Rebuttal ¶ 8 (App. 2299) (ABC affiliate claiming harm from denial of carriage experienced $3.8 million net revenue increase between 1986 and 1992); *id.*, ¶ 111 (App. 2403) (Home Shopping Network affiliate did not report to Congress that it was harmed by cable operator conduct between 1986 and 1992); *id.*, ¶ 83 (App. 2372–2373) (station alleged to have lost half of its cable carriage in fact obtained carriage on systems serving 80 percent of total cable subscribers within area of dominant influence); *id.*, ¶ 94 (App. 2385) (station claiming harm from denial of carriage experienced a $1.13 million net revenue increase between 1986 and 1993); *id.*, ¶ 30 (App. 2318) (some systems on which station claimed anticompetitive carriage denials were precluded from carrying station due to signal strength and quality problems). Congress' reasonable conclusions are entitled to deference, and for that reason the fact that the evidence is in conflict will not necessarily preclude summary judgment in appellees' favor. Nevertheless, in the course of our independent review, we cannot ignore sharp conflicts in the record that call into question the reasonableness of Congress' findings.

Moreover, unlike other aspects of the record on remand, the station-specific accounts cited by the Court do permit an evaluation of trends in the various broadcast markets, or "areas of dominant influence," in which carriage denials allegedly caused harm. The Court does not conduct this sort

of analysis. Were it to do so, the Court would have to recognize that all but *one* of the commercial broadcast stations cited as claiming a curtailment in operations or a decline in revenue was broadcasting within an area of dominant influence that experienced net growth, or at least no net reduction, in the number of commercial broadcast stations operating during the non-must-carry era. See Besen Declaration, Exh. 11 (App. 861–869); cf. JSCR ¶ 618 (App. 1553) (station claiming harm within Cedar Rapids market, with four commercial broadcast stations in 1987 and five in 1992); *id.*, ¶ 620 (App. 1554) (station claiming harm within Tulsa market, with seven commercial broadcast stations in 1987 and 1992); *id.*, ¶ 623 (App. 1554) (station claiming harm within New York City market, with 14 commercial broadcast stations in 1987 and 1992); *id.*, ¶ 692 (App. 1591) (station claiming harm within Salt Lake City market, with five commercial broadcast stations in 1987 and eight in 1992); *id.*, ¶ 695 (App. 1593–1594) (station claiming harm within Honolulu market, with seven commercial broadcast stations in 1987 and nine in 1992); *id.*, ¶ 703 (App. 1599) (station claiming harm within Grand Rapids market, with seven commercial broadcast stations in 1987 and 1992). Indeed, in 499 of 504 areas of dominant influence nationwide, the number of commercial broadcast stations operating in 1992 equaled or exceeded the number operating in 1987. Besen Declaration, Exh. 11 (App. 861–869). Only two areas of dominant influence experienced a reduction in the number of noncommercial broadcast stations operating between 1987 and 1992. *Ibid.* (App. 871–880).

In sum, appellees are not entitled to summary judgment on whether Congress could conclude, based on reasonable inferences drawn from substantial evidence, that "'absent legislative action, the free local off-air broadcast system is endangered.'" *Ante*, at 209 (quoting S. Rep. No. 102–92, at 42). The Court acknowledges that the record contains much evidence of the health of the broadcast industry, including

evidence that 263 new broadcast stations signed on the air in the period without must-carry rules, evidence of growth in stations' advertising revenue, and evidence of voluntary carriage of broadcast stations accounting for virtually all measurable viewership in noncable households. *Ante*, at 210–211. But the Court dismisses such evidence, emphasizing that the question is not whether Congress correctly determined that must-carry is necessary to prevent significant financial hardship to a substantial number of stations, but whether "the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress." *Ante*, at 211. Even accepting the Court's articulation of the relevant standard, it is not properly applied here. The principal opinion disavows a need to closely scrutinize the logic of the regulatory scheme at issue on the ground that it "need not put [its] imprimatur on Congress' economic theory in order to validate the reasonableness of its judgment." *Ante*, at 208. That approach trivializes the First Amendment issue at stake in this case. A highly dubious economic theory has been advanced as the "substantial interest" supporting a First Amendment burden on cable operators and cable programmers. In finding that must-carry serves a substantial interest, the principal opinion necessarily accepts that theory. The partial concurrence does not, but neither does it articulate what threat to the availability of a "multiplicity" of broadcast stations would exist in a perfectly competitive market.

## B

I turn now to the second portion of the *O'Brien* inquiry, which concerns the fit between the Government's asserted interests and the means chosen to advance them. The Court observes that "broadcast stations gained carriage on 5,880 channels as a result of must-carry," and recognizes that this forced carriage imposes a burden on cable system operators and cable programmers. *Ante*, at 215. But the Court also concludes that the other 30,006 cable channels occupied

by broadcast stations are irrelevant to measuring the burden of the must-carry scheme. The must-carry rules prevent operators from dropping these broadcast stations should other more desirable cable programming become available, even though operators have carried these stations voluntarily in the past. The must-carry requirements thus burden an operator's First Amendment freedom to exercise unfettered control over a number of channels in its system, whether or not the operator's present choice is aligned with that of the Government.

Even assuming that the Court is correct that the 5,880 channels occupied by added broadcasters "represent the actual burden of the regulatory scheme," *ibid.*, the Court's leap to the conclusion that must-carry "is narrowly tailored to preserve a multiplicity of broadcast stations," *ante*, at 215–216, is nothing short of astounding. The Court's logic is circular. Surmising that most of the 5,880 channels added by the regulatory scheme would be dropped in its absence, the Court concludes that the figure also approximates the "benefit" of must-carry. Finding the scheme's burden "congruent" to the benefit it affords, the Court declares the statute narrowly tailored. The Court achieves this result, however, only by equating the *effect* of the statute—requiring cable operators to add 5,880 stations—with the governmental *interest* sought to be served. The Court's citation of *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), reveals the true nature of the interest at stake. The "evi[l] the Government seeks to eliminate," *id.*, at 799, n. 7, is not the failure of cable operators to carry *these 5,880 stations*. Rather, to read the first half of the principal opinion, the "evil" is *anticompetitive behavior* by cable operators. As a factual matter, we do not know whether these stations were not carried because of anticompetitive impulses. Positing the effect of a statute as the governmental interest "can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored." *Simon & Schuster, Inc.* v. *Members of*

*N. Y. State Crime Victims Bd.*, 502 U. S. 105, 120 (1991). Without a sense whether *most* adverse carriage decisions are anticompetitively motivated, it is improper to conclude that the statute is narrowly tailored simply because it prevents *some* adverse carriage decisions. See *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989) (scope of law must be "in proportion to the interest served") (internal quotation marks omitted).

In my view, the statute is not narrowly tailored to serve a substantial interest in preventing anticompetitive conduct. I do not understand JUSTICE BREYER to disagree with this conclusion. *Ante*, at 227 (examining fit between "speech-restricting and speech-enhancing consequences" of must-carry). Congress has commandeered up to one-third of each cable system's channel capacity for the benefit of local broadcasters, without any regard for whether doing so advances the statute's alleged goals. To the extent that Congress was concerned that anticompetitive impulses would lead vertically integrated operators to prefer those programmers in which the operators have an ownership stake, the Cable Act is overbroad, since it does not impose its requirements solely on such operators. An integrated cable operator cannot satisfy its must-carry obligations by allocating a channel to an unaffiliated cable programmer. And must-carry blocks an operator's access to up to one-third of the channels on the system, even if its affiliated programmer provides programming for only a single channel. The Court rejects this logic, finding the possibility that the must-carry regime would require reversal of a benign carriage decision not "so prevalent that must-carry is substantially overbroad." *Ante*, at 216. The principal opinion reasons that "cable systems serving 70 percent of subscribers are vertically integrated with cable programmers, *so anticompetitive motives may be implicated in a majority of systems' decisions not to carry broadcasters.*" *Ante*, at 216–217 (emphasis added). It is unclear whether the principal opinion means that anticompetitive

motives may be implicated in a majority of *decisions*, or in decisions by a majority of *systems*. In either case, the principal opinion's conclusion is wholly speculative. We do not know which of these vertically integrated systems are affiliated with one cable programmer and which are affiliated with five cable programmers. Moreover, Congress has placed limits upon the number of channels that can be used for affiliated programming. 47 U. S. C. § 533(f)(1)(B). The principal opinion does not suggest why these limits are inadequate or explain why, once a system reaches the limit, its remaining carriage decisions would also be anticompetitively motivated. Even if the channel limits are insufficient, the principal opinion does not explain why requiring carriage of *broadcast* stations on *one-third* of the system's channels is a measured response to the problem.

Finally, I note my disagreement with the Court's suggestion that the availability of less-speech-restrictive alternatives is never relevant to *O'Brien's* narrow tailoring inquiry. *Ante,* at 217–218. The *Turner* Court remanded this case in part because a plurality concluded that "judicial findings concerning the availability and efficacy of constitutionally acceptable less restrictive means of achieving the Government's asserted interests" were lacking in the original record. 512 U. S., at 668 (internal quotation marks omitted). The Court's present position on this issue is puzzling.

Our cases suggest only that we have not interpreted the narrow tailoring inquiry to "require elimination of *all* less restrictive alternatives." *Fox, supra,* at 478. Put another way, we have refrained from imposing a *least*-restrictive-means requirement in cases involving intermediate First Amendment scrutiny. *Ward, supra,* at 798 (time, place, and manner restriction); *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984) (same); *Fox, supra,* at 478 (commercial speech). It is one thing to say that a regulation need not be the *least*-speech-restrictive means of serving an important governmental objective. It is quite another to

suggest, as I read the majority to do here, that the availability of less-speech-restrictive alternatives cannot establish or confirm that a regulation is substantially broader than necessary to achieve the Government's goals. While the validity of a Government regulation subject to intermediate First Amendment scrutiny does not turn on our "agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests," *United States* v. *Albertini,* 472 U. S. 675, 689 (1985), the availability of less intrusive approaches to a problem serves as a benchmark for assessing the reasonableness of the fit between Congress' articulated goals and the means chosen to pursue them, *Rubin* v. *Coors Brewing Co.,* 514 U. S. 476, 490–491 (1995).

As shown *supra,* at 251–252 and this page, in this case it is plain without reference to any alternatives that the must-carry scheme is "substantially broader than necessary," *Ward,* 491 U. S., at 800, to serve the only governmental interest that the principal opinion fully explains—preventing unfair competition. If Congress truly sought to address anticompetitive behavior by cable system operators, it passed the wrong law. See *Turner, supra,* at 682 (O'CONNOR, J., concurring in part and dissenting in part) ("That some speech within a broad category causes harm . . . does not justify restricting the whole category"). Nevertheless, the availability of less restrictive alternatives—a leased access regime and subsidies—reinforces my conclusion that the must-carry provisions are overbroad.

Consider first appellants' proposed leased access scheme, under which a cable system operator would be required to make a specified proportion of the system's channels available to broadcasters and independent cable programmers alike at regulated rates. Leased access would directly address both vertical integration and predatory behavior, by placing broadcasters and cable programmers on a level playing field for access to cable. The principal opinion never ex-

plicitly identifies any threat to the availability of broadcast television to noncable households *other than* anticompetitive conduct, nor does JUSTICE BREYER's partial concurrence. Accordingly, to the extent that leased access would address problems of anticompetitive behavior, I fail to understand why it would not achieve the goal of "ensuring that significant programming remains available" for noncable households. *Ante,* at 221. The Court observes that a leased access regime would, like must-carry, "reduce the number of cable channels under cable systems' control in the same manner as must-carry." *Ibid.* No leased access scheme is currently before the Court, and I intimate no view on whether leased access, like must-carry, imposes unacceptable burdens on cable operators' free speech interests. It is important to note, however, that the Court's observation that a leased access scheme may, like must-carry, impose First Amendment burdens does not dispose of the narrow tailoring inquiry in this case. As noted, a leased access regime would respond directly to problems of vertical integration and problems of predatory behavior. Must-carry quite clearly does not respond to the problem of vertical integration. *Supra,* at 251–253. In addition, the must-carry scheme burdens the rights of cable programmers *and* cable operators; there is no suggestion here that leased access would burden cable *programmers* in the same way as must-carry does. In both of these respects, leased access is a more narrowly tailored guard against anticompetitive behavior. Finally, if, as the Court suggests, Congress were concerned that a leased access scheme would impose a burden on "small broadcasters" forced to pay for access, subsidies would eliminate the problem.

Subsidies would not, of course, eliminate anticompetitive behavior by cable system operators—a problem that Congress could address directly or through a leased-access scheme. Appellees defend the must-carry provisions, however, not only as a means of preventing anticompetitive

behavior, but also as a means of protecting "marginal" or "vulnerable" stations, even if they are *not* threatened by anticompetitive behavior. The principal opinion chooses not to acknowledge this interest explicitly, although JUSTICE BREYER does. Even if this interest were content neutral—which it is not—subsidies would address it directly. The Court adopts appellees' position that subsidies would serve a "very different purpose than must-carry. Must-carry is intended not to guarantee the financial health of all broadcasters, but to ensure a base number of broadcasters survive to provide service to noncable households." *Ante*, at 222; see Brief for Federal Appellees 47. To the extent that JUSTICE BREYER sees must-carry as a "speech-enhancing" measure designed to guarantee over-the-air broadcasters "extra dollars," *ante*, at 226, it is unclear why subsidies would not fully serve that interest. In any event, I take appellees' concern to be that subsidies, unlike must-carry, would save some broadcasters that would not survive even *with* cable carriage. There is a straightforward solution to this problem. If the Government is indeed worried that imprecision in allocation of subsidies would prop up stations that would not survive even with cable carriage, then it could tie subsidies to a percentage of stations' advertising revenues (or, for public stations, member contributions), determined by stations' access to viewers. For example, in a broadcast market where 50 percent of television-viewing households subscribe to cable, a broadcaster has access to all households without cable as well as to those households served by cable systems on which the broadcaster has secured carriage. If a broadcaster is carried on cable systems serving only 20 percent of cable households (*i. e.*, 10 percent of all television-viewing households in the broadcast market), the broadcaster has access to 60 percent of the television-viewing households. If the Government provided a subsidy to compensate for the loss in advertising revenue or member contributions that a station would sustain by virtue of its

failure to reach 40 percent of its potential audience, it could ensure that its allocation would do no more than protect those broadcasters that would survive with full access to television-viewing households. In sum, the alleged barrier to a precise allocation of subsidies is not insurmountable. The Court also suggests that a subsidy scheme would "involve the Government in making content-based determinations about programming." *Ante*, at 222. Even if that is so, it does not distinguish subsidies from the must-carry provisions. In light of the principal opinion's steadfast adherence to the position that a preference for "diverse" or local-content broadcasting is not a content-based preference, the argument is ironic indeed.

## III

Finally, I note my disagreement with the Court's decision to sidestep a question reserved in *Turner*, see 512 U. S., at 643–644, n. 6; addressed by the District Court below, 910 F. Supp., at 750 (Sporkin, J.); fairly included within the question presented here; and argued by one of the appellants: whether the must-carry rules requiring carriage of low power stations, 47 U. S. C. § 534(c), survive constitutional scrutiny. A low power station qualifies for carriage only if the FCC determines that the station's programming "would address local news and informational needs which are not being adequately served by full power television broadcast stations because of the geographic distance of such full power stations from the low power station's community of license." § 534(h)(2)(B). As the *Turner* Court noted, "this aspect of § 4 appears to single out certain low-power broadcasters for special benefits on the basis of content." 512 U. S., at 644, n. 6. Because I believe that the must-carry provisions fail even intermediate scrutiny, it is clear that they would fail scrutiny under a stricter content-based standard.

In declining to address the rules requiring carriage of low power stations, the Court appears to question whether the

issue was fairly included within the question presented or properly preserved by the parties. *Ante*, at 224. This position is somewhat perplexing. The Court in *Turner* apparently found the issue both fairly included within the strikingly similar question presented there, compare Brief for Federal Appellees in *Turner*, O. T. 1993, No. 93–44, p. I, with Brief for Federal Appellees I, and properly preserved despite the lack of specific argumentation devoted to this subsection of the challenged statute in the jurisdictional statement there, see Juris. Statement in *Turner*, O. T. 1993, No. 93–44, pp. 11–28. The Court's focus on the quantity of briefing devoted to the subject, *ante*, at 224, ignores the fact that there are two groups of appellants challenging the judgment below—cable operators and cable programmers—and that the issue is of more interest to the former than to the latter. It also seems to suggest that a party defending a judgment can defeat this Court's review of a question simply by ignoring its adversary's position on the merits.

In any event, the Court lets stand the District Court's seriously flawed legal reasoning on the point. The District Court concluded that the provisions "are very close to content-based legislation triggering strict scrutiny," but held that they do not "cross the line." 910 F. Supp., at 750. That conclusion appears to have been based on the fact that the low power provisions are *viewpoint* neutral. *Ibid.* Whether a provision is viewpoint neutral is irrelevant to the question whether it is also *content* neutral. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 430 (1992) (STEVENS, J., concurring in judgment); *Turner, supra*, at 685 (GINSBURG, J., concurring in part and dissenting in part).

## IV

In sustaining the must-carry provisions of the Cable Act, the Court ignores the main justification of the statute urged by appellees and subjects restrictions on expressive activity to an inappropriately lenient level of scrutiny. The principal

opinion then misapplies the analytic framework it chooses, exhibiting an extraordinary and unwarranted deference for congressional judgments, a profound fear of delving into complex economic matters, and a willingness to substitute untested assumptions for evidence. In light of gaps in logic and evidence, it is improper to conclude, at the summary judgment stage, that the must-carry scheme serves a significant governmental interest "in a direct and effective way." *Ward*, 491 U. S., at 800. Moreover, because the undisputed facts demonstrate that the must-carry scheme is plainly not narrowly tailored to serving the only governmental interest the principal opinion fully explains and embraces—preventing anticompetitive behavior—appellants are entitled to summary judgment in their favor.

JUSTICE BREYER disavows the principal opinion's position on anticompetitive behavior, and instead treats the must-carry rules as a "speech-enhancing" measure designed to ensure access to "quality" programming for noncable households. Neither the principal opinion nor the partial concurrence explains the nature of the alleged threat to the availability of a "multiplicity of broadcast programming sources," if that threat does not arise from cable operators' anticompetitive conduct. Such an approach makes it impossible to discern whether Congress was addressing a problem that is "real, not merely conjectural," and whether must-carry addresses the problem in a "direct and material way." *Turner, supra*, at 664 (plurality opinion).

I therefore respectfully dissent, and would reverse the judgment below.