ALDISERT, Circuit Judge,
concurring:
I agree with the majority’s determination that the 1992 Coal Industry Retiree Health Benefit Act, 26 U.S.C. §§ 9701-9722 (1994 and Supp II) (“Coal Act”), as applied to Unity Real Estate Company and Barnes and Tucker Company does not violate substantive due process and is not an unconstitutional taking. I agree also that the retroactive scope of the Act is not beyond appropriate legislative power.
Although Appellants vigorously contend that their cases are analogous to Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), their analogical argument fails because the decisive material facts of the eases bear no similarity. The decisive material facts in Eastern Enterprises are that the company (1) left the coal industry in 1965 and (2) was never a party to the 1974 and later Wage Agreements that first suggested the commitment to lifetime benefits for retirees and family members. See Eastern Enterprises, 118 S.Ct. at 2150 (plurality opinion). Unlike the former coal operator in Eastern Enterprises, Appellants remained in the coal industry until 1981 and 1984 respectively, and participated in negotiations for the 1974 and later Wage Agreements. As emphasized in Eastern Enterprises, “It is the 1974, 1978 and subsequent agreements that first suggest an industry commitment to the funding of lifetime health benefits for both retirees and their family members.” Id. Appellants’ act of signing the 1974 and subsequent National Bituminous Coal Wage Agreements (NBCWA or “Wage Agreement”) precludes the rote application of Eastern Enterprises to these cases.
I.
On the due process question of “promises” and “representations” made to the miners, I would sustain the constitutionality of the Act as applied to the Appellants for one reason only: The evidence before Congress provided a rational basis to believe that a promise of lifetime benefits had been made. Congress relied on the Coal Commission Report, its appendices and the Commissioners’ testimony at the Senate hearing. For example, the Coal Commission Report stated:
The Commission firmly believes that retired miners are entitled to the health care benefits that were promised and guaranteed them and that such commitments must be honored....
Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored.
See Supp.App. at 350, 360 (Secretary of Labor’s Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report (1990)). These were important findings that were accepted by Congress.
Whether the Commission Report accurately portrayed the state of affairs in the coal mining industry at the time the 1974 Wage Agreement was negotiated and signed is largely irrelevant to what should be our analysis of the Coal Act’s constitutionality. In considering the question of who promised what to whom, I do not *679 believe that it is appropriate for any reviewing court to review de novo the history of the agreements or to parse their language.
I say this because, to paraphrase Holmes, “That’s not our- job.”[1] Once we get beyond that portion of the Due Process or Takings Clause analysis relating to the Coal Act’s financial effect on the Appellants, we must address whether there was deprivation of property without due process of law on the theory that the Appellants never promised any benefits beyond the lifetime of the Wage Agreements. Our job is not to examine the materials and to make an independent determination of this issue, a sort of ersatz fact-finding by either a federal trial or appellate court.
On this issue, as I see it, our job is merely to determine whether substantial evidence was presented before Congress. And I conclude that there was. The Coal Commission Report and other testimony before the Senate Committee informed Congress that “[rjetired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored.” Supp.App. at 360 (Secretary of Labor’s Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report (1990)). This determination serves as the rational basis for the legislation.
Our sole obligation is “to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.” Turner Broadcasting Sys. Inc. v. Federal Communications Comm’n, 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (internal quotations omitted). Substantial evidence “does not mean a large or considerable amount of evidence, but rather ‘such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.’ ” Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting Consolidated Edison Co. v. National Labor Relations Bd., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). ‘We owe Congress’ findings deference in part because the institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions.” Turner, 520 U.S. at 195, 117 S.Ct. 1174 (internal quotations omitted). On the basis of the record before Congress, I would conclude that there was substantial evidence to provide Congress with a rational basis for believing that the Coal Act was consistent -with promises that had been made by coal operators to their former employees.
II.
Important prudential considerations un-dergird the Court’s limitations on the judicial role. In the case at bar, reasonable persons can differ in evaluating the history of the critical Wage Agreements and interpreting its provisions. For example, although the majority has made a thorough and scholarly analysis of these circumstances, my own conclusions would be somewhat different. I would not rely on promises and representations made apparently dehors the explicit language of the Wage Agreements.
Critical to me is that the Wage Agreements expressly limited all of the promised retiree health benefits to the term of each agreement. Miners who retired after 1975, but whose former employers were no longer in the coal mining business, were *680 promised benefits through the United Mine Workers of America 1974 Benefit Plan and Trust (“1974 Plan”). See Eastern Enterprises, 118 S.Ct. at 2139-2140. Article XX(c)(3)(ii) of the NBCWA stated that the purpose of the 1974 Plan was to provide employee health benefits only “during the term of this Agreement.” Similarly, Article II of the 1974 Plan expressly stated that if the plan assets were to “become insufficient” to continue providing benefits after the NBCWA had expired, “the benefits may be suspended or reduced to amounts which, in the judgment of the Trustees, can be paid from the net assets.” The NBCWA contained a “General Description” of all promised benefits that expressly stated that health benefits were “guaranteed” at fixed levels only “during the term of this Agreement.” Similar provisions are found or incorporated in other agreements. I simply can find no evidence of any “promise” of lifetime benefits contained in any Wage Agreement. Any reliance on extra-contractual “promises” looks to a novel theory of law that turns a blind eye to the centuries-old law of contracts and to the current law on collective bargaining agreements.
To suggest that the clear language limiting benefits to the term of the Wage Agreement is trumped by the “lifetime” health card is a stretch.[2] By analogy, one could say that possession of a Social Security card “for life,” without more and without any proof of disability, entitles one to benefits. The “evergreen” clauses included in the 1978 Wage Agreement do not persuade me to reach a different result: My reading of these clauses is that they addressed only employer funding, not the scope of the underlying employee benefits.
As a native of Carnegie, Pennsylvania— a coal mining and steel mill town near Pittsburgh — who is old enough to remember the organizational efforts of John L. Lewis in the coal fields in the 1930s and the 1947 Krug-Lewis Agreement, I no doubt have a unique perspective. I know first-hand the mantra of every coal miner through decades of strikes and picketing: “No Contract, No.Work.”
To the miner, the actual contract controlled, not the expectation of future agreements. Without the contract in hand, the miners would not pick up then-lamps at the lamp house and descend into the shafts. They worked under the precise language in a given contract and under no other representations. The sordid history of the coal company towns that surrounded Carnegie, and the inhumane treatment of the miners and their families prior to effective unionization in the mines, impelled the miners to require thereafter that every representation of working conditions and benefits be set forth in clear language in a hard-fought written collective bargaining agreement.
The foregoing discussion is but my gratuitous interpretation of some of the history and contents of the Wage Agreements, and admittedly, it may be contrary to that expressed in most other judicial opinions. My views and those of judges with contrary interpretations are important in one respect only: My views and those of other judges are totally irrelevant. What is relevant is only that on the basis of evidence before it, Congress concluded that a promise of lifetime benefits had been made. This furnished the rational basis for enacting the controversial provisions of the Coal Act.
III.
This, too, must be said. I am conscious that in light of the view that we take here, the handwriting is on the wall that a kind of hydraulic pressure will generate eeo- *681 nomic disasters in companies whose financial circumstances are similar to Unity and Barnes and Tucker. Without additional and more realistic Congressional intervention, we may see a phenomenon of the “last man standing,” as companies disappear from the economic scene and responsibility for paying benefits shifts to surviving companies. If this case is any example and a forerunner of things to come, the operation of the present statutory solution to the vexing health benefit problem of retirees and their dependents may serve as a full employment program for bankruptcy lawyers of companies unable to make prescribed payments. Sadly, I do not believe that this statement is an argu-mentum ad terrorem.
I join in the judgment of the court.

. Learned Hand once reminisced: “I remember once I was with [Holmes]; it was a Saturday when the Court was to confer. It was before we had a motor car, and we jogged along in an old coupe. When we got to the Capitol, I wanted to provoke a response, so as he walked off, I said to him: 'Well, sir, goodbye. Do justice!’ ... He replied: 'That is not my job. My job is to play the game according to the rules.' ” Learned Hand, Continuing Legal Education for Professional Competence and Responsibility, Report on the Arden House Conference, at 116-123 (1958).

. The basis for the claim of a "lifetime” health card is in the "General Description” of the 1974 NBCWA, which states:
Any pensioned miner covered in this Plan will retain his Health Services card until
death, and upon his death his widow will retain a Health Services card until her death or remarriage.
See Appellants’ Supp. Br. at 6-7.